Rita ROTH, Delores Adair, Gary Budzinski, John Che-
lig, June LoCoco, George Farkus, Daryl R. Grober,
Vera Gross, Andrew Huppert, Donald L. Jackson,
Ronald Jackson, Harry Kalupa, DuWayne Kasal,
Nona Koellner, Al Ohrmund, Edward Paul, Cliff Peak,
Allen Reininger, Mildred Sievers, Fred Skerpea, Elain
Stechauner, Tony Stechauner, Caroline Stelzel,
Morene Tomasello, Robert Yourich and John Verhulst,
Plaintiffs-Appellants-Petitioners,

v.

CITY OF GLENDALE, Defendant-Respondent.

Supreme Court

*No. 97–3467. Oral argument November 30, 1999.—Decided
July 13, 2000.*

2000 WI 100

(Also reported in 614 N.W.2d 467.)

For the plaintiffs-appellants-petitioners, there were briefs by *Alvin R. Ugent* and *Podell, Ugent, Haney & Miszewski, S.C.*, Milwaukee, and oral argument by *Alvin R. Ugent.*

For the defendant-respondent there was a brief by *Kathy L. Nusslock, Gregory B. Ladewski*, and *Davis & Kuelthau, S.C.*, Milwaukee, and oral argument by *Kathy L. Nusslock.*

Amicus Curiae brief was filed by *Jeffrey P. Sweetland, Bruce F. Ehlke, Timothy E. Hawks*, and *Schneidman, Myers, Dowling, Blumenfield, Ehlke, Hawks & Domer*, Milwaukee, and oral argument by *Timothy E. Hawks* for District Council 40, AFSCME, AFL-CIO, Wisconsin Federation of Teachers, AFT, AFL-CIO, Wisconsin Education Association Council, Professional Fire Fighters of Wisconsin, IAFF, AFL-CIO, Wisconsin Federation of Nurses and Health Professionals, AFT, AFL-CIO, and Association of Law Enforcement Allied Services Personnel, Local 218, IUPA, AFL-CIO.

Amicus Curiae brief was filed by *John J. Prentice, Evan N. Claditis,* and *Prentice & Phillips*, Milwaukee, for Wisconsin Counties Association.

Amicus Curiae brief was filed by *Matthew R. Robbins, Andrea F. Hoeschen* and *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.*, Milwaukee, for Wisconsin State AFL-CIO.

¶ 1.   ANN WALSH BRADLEY, J.   Petitioners, retired employees of the City of Glendale, seek review of a published decision of the court of appeals that affirmed the circuit court order of summary judgment in favor of the City.[1] The retirees contend that the court of appeals erred in determining that they did not have a vested right to fully-paid health insurance benefits under a series of limited-term collective bargaining agreements. We conclude that a vesting presumption applies to these agreements in the absence of contrac-

---

[1] *Roth v. City of Glendale*, 224 Wis. 2d 800, 807–809, 593 N.W.2d 62 (Ct. App. 1999) (affirming order of summary judgment of the circuit court for Milwaukee County, Jacqueline D. Schellinger, J.).

tual language or extrinsic evidence indicating otherwise. Because the record here is undeveloped, we reverse and remand to the circuit court to determine whether health benefits vested under the retirees' collective bargaining agreements.

¶ 2.  Petitioners are 26 former employees of the City of Glendale who retired at different times between 1972 and 1996. All but four of the retirees had been members of a collective bargaining unit represented by Local 1261, affiliated with District Council 48, AFSCME, AFL-CIO. The parties agree that the four retirees who did not belong to the union received the same benefits and were treated no differently than the retirees who had been union members.

¶ 3.  The terms of the employment relationship were embodied in a series of collective bargaining agreements. As customary in this context, each agreement had a specified term of one to three years, expired, and then was re-negotiated by the parties.

¶ 4.  Between 1972 and 1996, there were 12 successive collective bargaining agreements. Initially, the agreements provided health insurance benefits at no cost to City employees and retirees. From 1972 until 1995, the agreements stated the following regarding retiree health insurance benefits:

> Any employee who retires from the City, shall be eligible for Blue Cross-Blue Shield Medicare Extended—365 days, when such retiree attains age sixty-five (65), with the City paying the entire premium for single or family coverage where applicable.[2]

---

[2] In the 1973–74 agreement, the wording of this clause was slightly different, although its substance was the same:

¶ 5. Over the years, the City and the Union negotiated a number of changes to the health insurance provisions of the collective bargaining agreements. Beginning in 1977 the agreements included a provision that stated that the health insurance provisions could be changed by mutual consent of the parties. The 1979–80 agreement added a clause stating that "[t]he employee contribution remains a negotiable item upon the expiration of this two-year agreement."

¶ 6. In the 1981–82 agreement, the parties eliminated the need for mutual consent to change insurance providers. According to this new provision, the City could unilaterally change the insurance provider as long as the change did not increase the cost to the individual group member and the coverages and benefits of the new program were equal to or greater than the coverages and benefits provided by Blue Cross-Blue Shield.

¶ 7. The 1989–91 agreement modified the length of service requirement regarding retirees' eligibility for health insurance benefits. Under previous agreements, retirees qualified for health insurance benefits after ten years of service to the City. Under the new terms, employees needed 15 years of service to qualify for retirement health insurance benefits. It is undisputed that all the retirees in this case had at least 15 years of creditable service to the City.

¶ 8. Another change in retiree health benefits was instituted in the 1992–94 collective bargaining agreement. Although under the earlier agreements the City paid the entire cost of the retirees' health insur-

---

Any employee who retires at age sixty-five (65) shall be covered under Blue Cross-Blue Shield Medicare Extended—365 days, with the City paying the entire premium for single or family coverage where applicable.

ance premiums, the new agreement required certain retirees to pay a portion of the premium themselves:

> Upon retirement, the City agrees to pay up to 105% of the lowest cost health insurance plan available in the City's service area (Milwaukee County) under the State Health Plan for family or single coverage, whichever is applicable until the employee reaches age 65. The retired employee shall pay the difference, if any, between the actual cost of the insurance coverage and the amount paid by the City.

The 1992–94 agreement, however, maintained the fully-paid health insurance premiums for retirees 65 years and older. Finally, in the 1995–97 agreement, the City and the Union negotiated a requirement that all retirees (not just those who retire before age 65) pay a portion of their health insurance premiums:

> Upon retirement, the City agrees to pay up to 105% of the lowest cost health insurance plan available in the City's service area (Milwaukee County) under the State Health Plan for family or single coverage, whichever is applicable. The retired employee shall pay the difference, if any, between the actual cost of the insurance coverage and the amount paid by the City.

The retirees were notified of the new terms by letter.

¶ 9. The retirees sued the City for breach of contract. They claimed a vested right to fully-paid health insurance benefits pursuant to the terms of the collective bargaining agreements in force at the time of their respective retirements. They sought an order that the City pay their entire health insurance premiums as provided by the earlier collective bargaining agreements. Additionally, the retirees sought damages for

the contributions they paid toward their premiums in the interim.

¶ 10. Subsequently, the retirees moved for summary judgment. The circuit court denied their motion and instead awarded summary judgment to the City.[3] The court distinguished *Schlosser v. Allis-Chalmers Corp.*, 86 Wis. 2d 226, 271 N.W.2d 879 (1978), the lynchpin of the retirees' argument. *Schlosser* held that retirement benefits—in that case, company-paid life insurance premiums—vest as to those employees who retire while the agreement providing the benefits is in effect, even when the agreement reserves to the employer the right to modify or terminate the benefits. The circuit court noted a key factual difference that it believed made *Schlosser* inapplicable to the Glendale retirees' claims: the benefits in *Schlosser* were conferred in connection with an open-ended employment agreement that never expired and was never modified. The Glendale agreements, by contrast, were of limited duration, expired, and were then renegotiated with different terms.

¶ 11. The circuit court instead applied *Senn v. United Dominion Industries*, 951 F.2d 806, 814–16 (7th Cir. 1992), because, as in this case, *Senn* addressed the question of whether retirement health benefits contained in a series of limited-term collective bargaining agreements vested upon retirement. The court found that, similar to the agreements in *Senn*, the Glendale collective bargaining agreements were silent about the vesting of retirement health benefits. The circuit court

---

[3] Wisconsin Stat. § 802.08(6) (1995–96) states: "If it shall appear to the court that the party against whom a motion for summary judgment is asserted is entitled to summary judgment, the summary judgment may be awarded to such party even though the party has not moved therefor."

also concluded that other provisions in some of the agreements, including the language permitting the parties to change the insurance carrier by mutual consent and the section stating that the employee's contribution remained a negotiable item upon expiration of the agreement, demonstrated unambiguously that the parties did not intend the benefits to vest.

¶ 12. The court of appeals affirmed, agreeing with the circuit court that because the case involved a limited-term collective bargaining agreement, *Schlosser* was distinguishable and *Senn* should be applied. *Roth v. City of Glendale*, 224 Wis. 2d 800, 807–09, 593 N.W.2d 62 (Ct. App. 1999). Since the agreements did not specifically mention vesting or explicitly state that the benefits were granted for life, the court of appeals held that the retirees had no vested right to fully-paid health insurance. *Id.* The dissent rejected *Senn*'s precedential value[4] and concluded instead that *Schlosser* was the proper precedent for this case. *Id.* at 811 n.1 (Fine, J., dissenting). The retirees sought review.

¶ 13. On a review of a grant of summary judgment we apply the same standard as does the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate if the record reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Wis. Stat. § 802.08(2) (1995–96).

---

[4] The majority of the court of appeals recognized it was not bound by federal case law on this issue but found *Senn v. United Dominion Industries*, 951 F.2d 806 (7th Cir. 1992), to be persuasive and adopted its reasoning. *Roth v. City of Glendale*, 224 Wis. 2d 800, 809, 593 N.W.2d 62 (Ct. App. 1999).

¶ 14. Although this case was not before the circuit court on cross-motions for summary judgment, neither the retirees nor the City raise any factual dispute. In addition, both parties argue that the contracts are unambiguous, and each claims entitlement to judgment as a matter of law.

¶ 15. This dispute centers on the proper interpretation of the collective bargaining agreements and whether they vest a legal right of the retirees to fully-paid lifetime health benefits.[5] Interpretation of a collective bargaining agreement, as with other contracts, presents a question of law that we review independently of the determinations rendered by the circuit court and the court of appeals. *See Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co.*, 2000 WI 26, ¶ 22, 233 Wis. 2d 314, 327, 607 N.W.2d 276. In interpreting a contract, the objective is to ascertain the intent of the contracting parties. *Maas by Grant v. Ziegler*, 172 Wis. 2d 70, 79, 492 N.W.2d 621 (1992).

¶ 16. The retirees assert that the collective bargaining agreements unambiguously express the intent to vest fully-paid lifetime health benefits. A finding to the contrary unfairly dismisses the employees' compliance with their "end of the bargain," at least 15 years of service to the City of Glendale. According to the retirees, a determination that their benefits vested upon retirement enforces their legitimate expectations as

---

[5] ERISA requires vesting of pension benefits; it does not require vesting of health or other retirement "welfare" benefits. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983); *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 603 (7th Cir. 1989). Retirement welfare benefits, and the question of whether they vest, are matters left to contract.

employees and most accurately reflects the bargaining process for retirement benefits. Criticizing both the circuit court and the majority of the court of appeals for relying on the Seventh Circuit's decision in *Senn*, the retirees maintain that this court's decision in *Schlosser* controls the outcome of this case.

¶ 17. In *Senn*, a class of retirees sued their employer after the employer terminated life and health insurance benefits arising under a series of limited-term collective bargaining agreements in effect when the employees retired. The district court found the contracts ambiguous and admitted extrinsic evidence, eventually upholding the jury verdict that the parties intended the vesting of lifetime benefits. Reversing the district court, the Seventh Circuit concluded that the agreements were unambiguous and thus a resort to extrinsic evidence was unwarranted. *Senn*, 951 F.2d at 807, 816.

¶ 18. The court adopted a "default rule" that "entitlements established by collective bargaining agreements do not survive their expiration or modification." *Id.* at 816 (quoting *Merk v. Jewel Cos.*, 848 F.2d 761, 763 (7th Cir. 1988)). Applying this rule, it determined that the silence of the contracts as to the vesting of benefits did not render the agreements ambiguous, but rather demonstrated that the parties did not intend these benefits to survive the term of the agreements. *Id.* Thus, *Senn* required explicit language or other affirmative indication in the contract to rebut the default rule that benefits generally do not continue beyond the life of the agreement.

¶ 19. In this case, neither the circuit court nor the court of appeals noted that the Seventh Circuit revisited *Senn* the following year in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir. 1993) (en banc).

182

*Bidlack* presented similar facts to this case and also involved the issue of whether retirement benefits vested under the retirees' collective bargaining agreements.

¶ 20. These collective bargaining agreements provided fully-paid health benefits for employees after they attained 65 years of age. *Id.* at 605. In addition, the agreements stated that the benefits would continue for spouses after the retirees' death. *Id.* Because the agreements lacked explicit language vesting benefits, the circuit court granted summary judgment to the employer.

¶ 21. The Seventh Circuit reversed and remanded. The *Bidlack* majority maintained adherence to the general presumption, or default rule, set forth in *Senn* that employee welfare benefits established by collective bargaining agreements lapse with the expiration of those agreements. *Id.* at 607. However, the majority recognized that the presumption was rebuttable and discussed how the presumption could be overcome. *Id.*

¶ 22. Employing a general contract analysis, the court noted that the words of the contract form the initial focus of the vesting analysis. Only if the language is ambiguous may extrinsic evidence be considered. In the absence of contract language or extrinsic evidence indicating an intent to vest benefits, thereby rebutting the presumption, the majority concluded that the no-vest presumption governs.

¶ 23. Thus, the *Bidlack* majority rejected as formalistic the rigid *Senn* approach to contractual language because that approach required explicit vesting language to be set forth in the contract. *Id.* at 607. Likewise, it rejected the other extreme approach that

parties may freely consult extrinsic evidence to demonstrate the intent to vest benefits. *Id.*

¶ 24.    The *Bidlack* concurrence agreed with the majority that the first step in any vesting analysis centers on the language of the collective bargaining agreement. *See id.* at 611 (Cudahy, J., concurring). If the language is ambiguous, then consideration of extrinsic evidence is permitted. *Id.* However, the concurrence advocated a presumption in favor of vesting.

¶ 25.    The vesting presumption articulated by the concurrence differs from the majority's approach to the language of the agreement and to the extrinsic evidence. It presumes that benefits will vest unless the language of the agreement suggests otherwise. *Id.* When the agreement is ambiguous, extrinsic evidence may be consulted to rebut the presumption and to demonstrate that the parties did not intend the benefits to vest. *Id.*

¶ 26.    We adopt the vesting presumption, alternatively characterized as a default rule, advocated by the *Bidlack* concurrence. This presumption comports with "a more far-reaching understanding of the context in which retiree benefits arise" and serves to fulfill the legitimate expectations of employees who have bargained for these benefits. *Keffer v. H.K. Porter Co., Inc.,* 872 F.2d 60, 64 (4th Cir. 1989).

¶ 27.    Employment benefits represent a critical bargaining tool for employers in attracting and maintaining personnel. The employer's promise of such benefits is an inducement to provide services for that particular employer to the exclusion of other employment opportunities. *See Lovett v. Mt. Senario College, Inc.,* 154 Wis. 2d 831, 837, 454 N.W.2d 356 (Ct. App. 1990) ("[T]he inducement of a retirement program pro-

vides a reciprocal benefit to employer in terms of employee retention.").

¶ 28. Bargained for benefits are not gratuities handed to the employee, but rather deferred compensation for past services rendered. If employees trade off present wages for benefits upon retirement, they expect assurance that these benefits will continue into the future. *International Union, United Auto., Aerospace & Agric. Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). They do not expect their earned benefits to be whittled away, subject to the contingencies of future negotiations. *Id.* Indeed, a no-vest presumption carries the danger of transforming services into a gratuity for the employer.

¶ 29. Retirement benefits are essentially "status" benefits that carry with them an inference that they continue as long as the prerequisite status is maintained and the beneficiary remains a retiree. *Maurer v. Joy Technologies, Inc.,* 212 F.3d 907 (6th Cir. 2000) (quotations omitted). The right to receive health and welfare benefits arises from the retiree's status as a past employee and is not dependent on a continued or current relationship with the employer. *Local Union No. 150–A v. Dubuque Packing Co.*, 756 F.2d 66, 70 (8th Cir. 1985).

¶ 30. In *Schlosser v. Allis-Chalmers Corp.*, this court recognized the inequity underlying any subsequent chipping away of retirement benefits:

> Clearly, under our present economic system, an employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such circumstances, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder.

185

86 Wis. 2d 226, 247, 271 N.W.2d 879 (1978) (quoting *Cantor v. Berkshire Life Ins. Co.*, 171 N.E.2d 518, 522 (1960)).

¶ 31.  Although *Schlosser* presents slightly varied facts, we disagree with the circuit court and the court of appeals that the case provides no guidance in our analysis. The type of contracts at issue in both cases may differ in form but the employers' actions had the same legal effect of denying the employees retirement benefits. *Schlosser* was not decided on the singularity of the facts but rather on general equitable principles underlying the employer-employee bargaining process.

¶ 32.  Thus, the principles espoused by the *Schlosser* court do not ring hollow in this particular context of retiree health benefits. Allowing employers to modify past contractual obligations, when there is no indication that benefits are for a fixed term only, renders the promise of retirement benefits illusory and defies these equitable principles.

¶ 33.  An economic consideration that cannot be swept under the rug is that many retirees live solely on their retirement benefits. Retirees with fixed incomes are generally ill-prepared to meet additional financial obligations that were unanticipated and that may be incrementally modified without notice.

¶ 34.  A presumption in favor of vesting that may be rebutted only by contrary indication in the language of the agreement or extrinsic evidence safeguards retirees from potential economic devastation. Other jurisdictions have recognized this inference of vesting. *See, e.g., International Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999); *Jansen v. Greyhound Corp.*, 692 F. Supp. 1029, 1034 (N.D. Iowa 1987); *Schultz v. Teledyne, Inc.*, 657 F. Supp. 289,

292–93 (W.D.Pa. 1987); *United Steelworkers of Am. v. Newman-Crosby Steel, Inc.*, 822 F. Supp. 862, 866 (D.R.I. 1993). Any other presumption fails to afford commensurate protection to retirees and does not recognize the import of the bargaining process for retirement benefits.

¶ 35.    Indeed, retirees are presumably aware that the union is not obligated to represent their interests for the purposes of bargaining for continued benefits. *See Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20 (1971); *Dubuque Packing Co.*, 756 F.2d at 70; *Bence v. City of Milwaukee*, 107 Wis. 2d 469, 490, 320 N.W.2d 199 (1982). This bargaining may create conflicts of interests between the retirees and the current union employees. As recognized by the United States Supreme Court in *Allied Chemical*, 404 U.S. at 173:

> Pensioners' interests extend only to retirement benefits, to the exclusion of wage rates, hours, working conditions, and all other terms of active employment. Incorporation of such a limited-purpose constituency in the bargaining unit would create the potential for severe internal conflicts that would impair the unit's ability to function and would disrupt the processes of collective bargaining. Moreover, the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits.

¶ 36.    A presumption in favor of vesting retirement benefits absent contrary indication serves to protect the voiceless in the subsequent negotiating process. Otherwise, unions that are negotiating on behalf of current employees may unilaterally bargain away contractual promises made to retirees, thereby frus-

187

trating the expectations of employees who have earned retirement benefits by providing past services.

¶ 37.   We reject the court of appeals' adoption of an implied consent theory that allows unions to bargain away retirement benefits without an affirmative consent to representation by the retirees. The court offered no authority for this leap away from precedent to promote a theory that all of the parties—the retirees, the union, and the City—disavowed at oral argument.

¶ 38.   The notion of implied consent is also inconsistent with precedent recognizing the conflict in simultaneously representing retirees and current employees for collective bargaining purposes. *Allied Chemical*, 404 U.S. at 173. Finally, this theory is at odds with the legal effect of vesting. If the retirement benefits vest under the collective bargaining agreements, they cannot be whittled away by future negotiations.

¶ 39.   Because the court of appeals erroneously relied on *Senn*'s rigid no-vest presumption, we reverse its decision. However, the record before this court is sparse and undeveloped. It does not contain the complete collective bargaining agreements and thereby precludes us from applying a vesting presumption to the language of the contracts and to related provisions. Therefore, we remand the cause to the circuit court for a determination of whether the collective bargaining agreements vested health benefits for the retirees.

¶ 40.   In sum, we determine that a vesting presumption applies under the collective bargaining agreements in the absence of contract language or extrinsic evidence indicating an intent against the vesting of retiree health benefits. A vesting presumption comports with the realities of the bargaining

process for retirement benefits and the equitable principles underlying that process. Because the record before us is incomplete and precludes an application of the vesting presumption, we reverse and remand the cause to the circuit court.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶ 41.   DIANE S. SYKES, J. *(concurring)*. The majority adopts the approach of the concurring opinion in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 611 (7th Cir. 1993)(en banc)(Cudahy, J., concurring) as the analytical framework for determining whether retirement welfare benefits in collective bargaining agreements are vested. I would adopt the approach of the lead opinion in *Bidlack*, and therefore concur.

¶ 42.   As the majority notes, the lead opinion in *Bidlack* retreated from *Senn's*[1] bright-line approach regarding vesting language in collective bargaining agreements, establishing instead an analytical approach to the question that focuses on traditional rules of contract interpretation while maintaining an initial presumption that rights and obligations cease upon the expiration of the contract. *Id.* at 607. The concurrence applauded the retreat, but would have gone further to apply a different initial presumption: that benefits vest and therefore continue beyond the expiration of the contract, unless otherwise specifically stated. *Id.* at 613 (Cudahy, J., concurring). Apparently, the concurrence would have overruled *Senn*, and in fact went so far as to say that "*Senn* and its default rule now

---

[1] *Senn v. United Dominion Industries*, 951 F.2d 806, 814–16 (7th Cir. 1992).

do seem. . .to be a dead letter." *Id.* at 610 (Cudahy, J., concurring).

¶ 43. *Bidlack* involved a class action suit filed by retired employees of the Wheelabrator Corporation. The lead opinion, by Chief Judge Richard Posner, framed the question presented by the case in this way:

> [W]hether the absence from the collective bargaining agreements of any provision that explicitly vests the health benefits of retired employees defeats those employees' claims even though some contractual language and a great deal of 'extrinsic' evidence—evidence apart from the language of the agreements—suggest that the parties may have intended to confer vested rights on the retired employees, that is, rights that would outlast the expiration of the last collective bargaining agreement.

*Id.* at 605.

¶ 44. The Wheelabrator collective bargaining agreements stated that "those employees who have retired since September 22, 1959, will have the full cost of their Blue Cross-Blue Shield coverage paid by the Company after they attain sixty-five (65) years of age," and that the benefits "shall be continued for the spouse after the death of the retiree." *Id.* at 605. As in this case, the district court in *Bidlack* concluded that the employer was entitled to summary judgment because the language of the agreements did not explicitly state that the benefits vested at retirement. *Arndt v. Wheelabrator Corp.*, 763 F. Supp. 396, 404, 406 (N.D. Ind. 1991). The *en banc* Seventh Circuit reversed.

¶ 45. Judge Posner began his analysis with the following general observation: "[O]rdinarily when a contract expires, it—expires. It is at an end. The parties have no more rights or duties under it. Sometimes,

however, a contract creates entitlements that outlast it." *Bidlack*, 993 F.2d at 606. The trick, of course, is determining which are the determinate rights or obligations and which are the indeterminate ones.

¶ 46. The starting point is the presumption, deriving from the foregoing basic principle, that because it has a fixed term, "a collective bargaining agreement ceases to obligate the employer when the agreement's term. . .is up." *Id.* at 607. The lead opinion in *Bidlack*, therefore, left *Senn*'s basic presumption in place. But the court went on to note that "it is not an irrebuttable presumption. 'Rights which accrued or vested under the [collective bargaining] agreement will, as a general rule, survive termination of the agreement.' The question is what it takes to rebut the presumption." *Id.* (citation omitted).

¶ 47. The *Bidlack* court then rejected two interpretive extremes: 1) that to rebut the presumption that benefits expire when the agreement expires (in other words, do not vest), the contract must either use the word "vest" or other similarly unequivocal language; and 2) that to rebut the presumption the parties can freely substitute testimony regarding the parties' intentions for contractual language indicative of intent. *Id.* The court said the former approach would institute excessive formalism and the latter would deprive parties of the protection of a written contract. *Id.*

¶ 48. The *Bidlack* court concluded, and I agree, that in this context, as in all contract cases, the court should look first to the four corners of the contract itself for evidence to rebut the initial presumption that the obligation expires when the contract does. If the contract language unambiguously confirms the presumption—or overcomes it—the analysis is over,

and the court must apply the contract as written. To overcome the presumption, however, the word "vest" (or similar equivalent) need not necessarily appear, if the intent to establish a right which survives the expiration of the agreement is otherwise clear from the language used and the overall language and logic of the contract. *Id.* ("[W]e do not think that a court should refuse to enforce a contract merely because the parties have failed to use a prescribed formula").

¶ 49. If, however, the contract is ambiguous, the court may look to extrinsic evidence to attempt to determine the parties' intent. The *Bidlack* court cautioned, and I would too, that ambiguity cannot be *created* by extrinsic evidence:

> [T]he use of extrinsic evidence to create such obligations [to pay lifetime medical benefits] nowhere alluded to in the contract would unjustifiably deprive the parties of the limitation of liabilities that is implicit in the negotiation of a written contract having a definite expiration date. Subject only to the limited protection against unforeseeable contractual obligations that is conferred by the doctrine of impossibility, a party might find itself saddled with obligations for the next twenty or thirty years (or even more, in the case of a surviving spouse's benefits) even though it had reasonably believed that all its obligations would end in three years, when the contract expired by its own terms. Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, there must be either contractual language on which to hang the label of ambiguous or some yawning void. . .that cries out for an implied term. *Extrinsic evidence should not*

*be used to add terms to a contract that is plausibly complete without them."*

*Id.* at 608 (citations omitted)(emphasis supplied). The parol evidence rule also provides a limitation on the use of extrinsic evidence. *Id.* (["T]he parol evidence rule. . .enforces integration clauses by barring evidence of side agreements, [although it] does not bar the use of extrinsic evidence to clarify the meaning of an ambiguous text"). Finally, if the agreement is completely silent about the duration of the benefits, and there is nothing in the logic, structure or other provisions of the contract that suggests that the benefits were meant to survive the expiration date, resort to extrinsic evidence is improper. *Id.*

¶ 50. Ultimately, if an examination of relevant and admissible extrinsic evidence fails to clarify the contractual ambiguity, the court may resort to the application of a default rule of contract interpretation. *Id.* at 609. Judge Posner clarified what is meant by "default rule," and when it is appropriate to invoke one:

> The contract, even when its logic and its other provisions as well as just the provision in issue are considered, is inconclusive on the question whether it confers an entitlement to health benefits that outlasts the contract's expiration date. A completely intractable issue of contract interpretation can be resolved only by the application of some default rule—a burden of persuasion, a clear-meaning rule, a presumption based on the authorship of the contract. But the time to throw up one's hands and apply such a rule is *after* extrinsic evidence has been considered. For until then, we do not know whether we have an intractable interpretive issue or merely an issue that cannot be resolved without

testimony or other evidence besides the language and logic. . .of the contract.

Only a posture, not easy to reconcile with the Seventh Amendment, of extreme mistrust of juries would entitle us to pretermit a factual inquiry and apply an interpretive canon or other tie-breaker *before* we know that the sides are actually tied.

*Id.*

¶ 51. *Senn* and the concurrence in *Bidlack* had referred to the initial presumption as a "default rule," which, as this passage of the lead opinion in *Bidlack* makes clear, is technically incorrect. The initial "no-vest" presumption is a creature of the contract itself, because it has a limited term, and applies at the beginning of the interpretive process. It may be overcome by other contract language indicative of an intent to grant a lifetime benefit, or extrinsic evidence (if the contract language is vague) or both. A "default rule," properly understood, is a judicial canon of contract construction (such as the rule that we construe contracts against the drafter) that applies only in the event of an unresolvable ambiguity—a tie—and only at the end of the process after extrinsic evidence has failed to clear up the question.

¶ 52. The initial presumption of vesting proposed by the *Bidlack* concurrence and adopted by the majority in this case represents a policy preference that I share but am constrained by the law of contracts from imposing upon the parties to a written, limited-term collective bargaining agreement. The contract sets the rights and liabilities of the parties, not the policy preferences of this court.

¶ 53. The majority relies in part on the policy articulated in *Schlosser v. Allis-Chalmers Corp.*, 86 Wis. 2d 226, 271 N.W.2d 879 (1978). However, as both

lower courts concluded, *Schlosser* is fundamentally factually distinguishable. There, the retirees had been salaried, nonunion employees whose employment arrangement with Allis-Chalmers was ongoing, open-ended and had no fixed expiration date. The court essentially construed the insurance benefits at issue in that case as a part of the open-ended employment agreement when it held that the benefit level at the time of retirement vested and could not be unilaterally modified later. Here we have a series of fixed-term collective bargaining agreements that were continually renegotiated upon expiration.

¶ 54.  It is one thing to find that a continuing obligation of indefinite duration (free life insurance for life in *Schlosser*) vests upon retirement under a continuing, open-ended contract which is itself of indefinite duration. It is another thing to find that an indefinite, continuing obligation (free health insurance for life in this case) vests upon retirement and therefore *survives the expiration of* a fixed-term collective bargaining agreement, the obligations of which otherwise terminated when the contract did. *Schlosser*'s rationale of retirement welfare benefit vesting cannot be readily transplanted into the collective bargaining context.

¶ 55.  Accordingly, I would adopt the analysis of the lead opinion in *Bidlack* and remand to the circuit court to apply it.[2] Therefore, I respectfully concur.

---

[2] For examples of post-*Bidlack* cases applying its analysis, see *Pabst Brewing Company, Inc. v. Corrao*, 161 F.3d 434 (7th Cir. 1998); *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir. 1996); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560 (7th Cir. 1995); *Rossetto v. Pabst Brewing Company, Inc.*, 71 F.Supp.2d 913 (E.D. Wis. 1999).

¶ 56. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this concurring opinion.