LITTLE CHUTE AREA SCHOOL DISTRICT,
Plaintiff-Respondent,

v.

WISCONSIN EDUCATION ASSOCIATION COUNCIL,
Lois Alferi, Michael Baye, Joe Beck,
Richard Bender, Mary Bond, Margaret Callies,
Robert Church, Irene Fanta, Charles Fischer,
Jo Gehl, Mary Jane Grissman, Joyce Ison,
Julie Janquart, Karen Jones, Cindy Johnson-
Tank, Judith Kickland, Jane Klozotsky,
Robert Klozotsky, Charles Kocken,
Patty Loppnow, Cheryl Leatherbury,
Dan McInnis, Ronald Meidam, Francis (Al)
Schmidt, Deb Schnell, Robert Schottmuller,
Pat Schultz, Sherry Simon, Susan Solberg,
Rose Stipek, Kay St. John, Richard Switzer,
Kay Tripp, Dorothy Van Lith, Robert
Van Gompel, Margaret Wippich and
David Zamzow, Defendants-Appellants.

Court of Appeals

*No. 2015AP2033. Submitted on briefs March 15, 2016.
—Decided January 18, 2017.*

2017 WI App 11

(Also reported in 892 N.W.2d 312.)

669

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Randall R. Garczynski, Elizabeth A. Fernandez, Christina M. Ripley, Wisconsin Education Association Council*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel J. Borowski, Andrew T. Phillips* and *Christine V. Hamiel*, of *Von Briesen & Roper, S.C.*, Milwaukee.

Before Stark, P.J., Hruz and Seidl, JJ.

¶ 1. HRUZ, J. The Wisconsin Education Association Council ("WEAC") and thirty-seven retirees (collectively and with WEAC, the "Retirees") from the Little Chute Area School District (the "District") appeal a summary judgment in the District's favor. In 2013, the District terminated its group long-term care ("LTC") insurance policy for the District's active employees and retirees. The District then filed the present declaratory judgment action, seeking a declaration that it was permitted, under the terms of the relevant collective bargaining agreements ("CBAs"), to terminate the group LTC policy. After analyzing the CBAs' provisions, the circuit court agreed with the District and rejected the Retirees' argument that they had a "vested right" to continuing insurance benefits under the specific group LTC policy that had been terminated. We affirm.

## BACKGROUND

¶ 2. This case concerns a series of CBAs entered into between the District and the Little Chute Education Association ("LCEA"), a WEAC local bargaining unit.[1] Each CBA was generally in force for two years, then it expired and was supplanted by a new agreement that oftentimes contained identical or similar provisions.

¶ 3. Each CBA described the compensation and benefits for current employees during the term of the agreement. Employees received a number of benefits, among them insurance coverage under the District's group LTC policy. Between 1995 and 2001, the CBAs identified the specific group LTC policy under which the employees received coverage as "WEAIT Insurance Cor-

---

[1] Each CBA was denominated "Master Agreement." We use those terms interchangeably throughout this opinion.

poration Plan #333–235.0." This reference to the specific policy number appears to have ceased beginning with the 2001–2003 CBA.[2]

¶ 4. The District's WEAIT group LTC policy remained virtually unchanged between 1994 and 2013. The policy did not require the District to keep the policy in force for any specific length of time, but rather the District could terminate the policy by giving WEAIT advance written notice. WEAIT, too, was allowed to terminate the policy under certain conditions, including premium nonpayment, the District's failure to negotiate the terms of coverage with the local bargaining unit, or if one-hundred percent of the employees eligible for coverage failed to enroll.

¶ 5. An individual's coverage under the WEAIT group LTC policy typically terminated when the person ceased employment with the District. Early retirees under the relevant CBAs, however, could elect to continue coverage, which was effective "as long as [WEAIT] receive[d] the required premiums and continue[d] to insure the active employees" of the District. The policy included a "paid-up" feature under which a covered person would owe no further premiums if he or she: (1) was retired; (2) was at least age sixty-five; and (3) had premium payments made on his or her behalf for at least 360 months. Retired employees could also elect an "accelerated paid-up" option that required a single, lump-sum payment if certain conditions were met. Once a person reached "paid-up" status, their coverage was not subject to termination.

---

[2] The Retirees contend "[e]very CBA from 1995–2011 expressly identified the WEAIT group LTC policy." Although the District apparently accepts this characterization, the record pages to which the parties cite for the 2001–2011 CBAs do not appear to identify any specific policy number.

¶ 6. Under the terms of each CBA relevant to this case, early retirees from the District were permitted to "continue participation" in the District's group LTC policy, subject to the carrier's terms and conditions.[3] Initially, the District agreed that early retirees could remain covered by the group LTC policy until age sixty-five. However, in the 2001–2003 and subsequent CBAs, the parties agreed to cap a retired employee's eligibility for coverage at "a maximum of ninety-six (96) months."[4]

¶ 7. The 2001–2003 CBA brought other changes to the group LTC insurance benefit, which changes continued in subsequent CBAs. In July of 2000, our supreme court had decided *Roth v. City of Glendale*, 2000 WI 100, 237 Wis. 2d 173, 614 N.W.2d 467, which held that retirement health benefits are presumed to "vest" in the absence of contract language or extrinsic evidence suggesting otherwise.[5] *Id.*, ¶ 25. The follow-

---

[3] A member's eligibility for early retirement depended upon his or her age and total years of service to the District.

[4] The CBAs divided the ninety-six-month LTC insurance benefit in half relative to the District's obligations to pay for the insurance coverage. During the first forty-eight months of postretirement group LTC coverage, the District would pay the entire cost of the insurance, up to the maximum monthly contribution made by active employees. The District's payments were capped during the second forty-eight months of coverage to the amount it paid in the forty-eighth month, with the early retirees paying any overage.

[5] Although the court did not explain the parameters of the term "vesting" in *Roth v. City of Glendale*, 2000 WI 100, 237 Wis. 2d 173, 614 N.W.2d 467, it appears the word simply refers to an employment or other benefit that cannot be circumscribed unilaterally by the employer. *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006) ("If a welfare benefit has not vested, 'after a CBA expires, an employer generally is free to modify or terminate any retiree

ing year, the District and the LCEA agreed to make early retirees' continued participation in the group LTC program subject to "any collectively bargained changes in those benefits and programs," in addition to being subject to the carrier's terms and conditions as before. In addition, the parties inserted a clause at the end of the section pertaining to group LTC coverage, stating: "The benefits, premiums, and contributions under this Article are established for the term of this collective bargaining agreement and subject to amendment, termination or extension through future collective bargaining."

¶ 8. These provisions remained in place through the 2009–2011 CBA. Then, on the eve of the effective date of 2011 Wis. Act 10,[6] the District and the LCEA negotiated an extension of the 2009–2011 CBA, known as the 2009–2012 Master Agreement. This new CBA eliminated all postretirement insurance benefits, including group LTC insurance benefits, for early retirees.[7] Effective July 1, 2011, Article 16 of the CBAs, which had previously defined early retiree benefits, was deleted entirely from the 2009–2012 Master Agreement. The District terminated the WEAIT group LTC policy in June of 2013.[8]

---

medical benefits that the employer provided pursuant to that CBA.' " (quoted source omitted)); *see also Vested,* BLACK'S LAW DICTIONARY (10th ed. 2014).

[6] Act 10 limited the matters on which general municipal employees could collectively bargain. *See* 2011 Wis. Act 10, § 210.

[7] The Retirees summarily assert that because the new CBA was not signed until after the effective date of 2011 Wis. Act 10, it was "void ab initio." This argument is conclusory, and we will not address it. *See State v. Pettit,* 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

[8] Upon termination of the group LTC policy, the structure of the CBAs between 1995 and 2011 effectively created three

¶ 9. The District's termination of the WEAIT group LTC policy triggered certain conversion provisions under the policy. Early retirees had an opportunity to purchase an individual "conversion policy" that featured the same coverage as the defunct group policy, with premium payments counted toward "paid-up" status. However, early retirees no longer received the benefit of a group-rate premium. Rather, these individual policies had premiums based on the individual's actuarial factors, including the retired employee's age, gender, and geographic location. Qualifying early retirees could also elect the "accelerated paid-up" option and pay a significant lump sum.[9]

¶ 10. On October 24, 2013, the Retirees provided the District's board of education with a notice of injury and claim. The Retirees asserted the District breached the relevant CBAs by curtailing their vested benefits, including "the right to continue to be members of the group LTC policy and to pay the group rates until the

categories of early retirees relevant to this appeal: (1) early retirees who were entitled to (and received) group LTC insurance through age sixty-five; (2) early retirees who were entitled to participate in (and received) paid group LTC insurance for ninety-six months after retirement; and (3) early retirees who were entitled to participate in the group LTC coverage, but received less than ninety-six months of paid group LTC insurance.

Five of the Retirees retired under the CBAs in effect from 1995–2001, which provided for participation rights until age sixty-five. The remainder of the Retirees retired under the CBAs in effect between 2001 and 2011, which provided post-retirement participation rights for ninety-six months. Of these Retirees, nine received the full ninety-six months of premium payments and coverage; the remaining twenty-three Retirees received less than ninety-six months of postretirement premium payments and coverage.

[9] The Retirees claim the lump-sum payment "averaged" between $29,500 and $34,000.

policy was 'paid up' or the retirees chose not to continue payments." They also asserted they had a vested right to the District contributing to the group LTC policy premiums.

¶ 11. The District filed a preemptive suit against the Retirees, seeking declaratory relief in the form of an order stating the District was not prohibited from terminating group LTC insurance for current or former employees.[10] The Retirees counterclaimed, alleging the District had breached the relevant CBAs and its duty of good faith and fair dealing. The case was decided upon the parties' cross-motions for summary judgment.

¶ 12. At a hearing on the motions, the circuit court granted the District judgment on both its declaratory action and the Retirees' counterclaims. After reviewing standard principles of contract interpretation and *Roth*, the circuit court concluded the plain language of the relevant CBAs did not require the District to maintain the WEAIT group LTC policy indefinitely, "or even until the [Retirees] achieved paid-up status." The court also rejected the Retirees' argument that vesting occurred because the CBAs incorporated the WEAIT group LTC policy, reasoning that even if such incorporation occurred, the policy provision allowing the District to terminate the policy at any time with advance notice was incompatible with vesting. The Retirees appeal.

## DISCUSSION

¶ 13. We review a grant of summary judgment de novo, applying the same methodology employed by the

[10] The complaint also challenged WEAC's standing to bring suit in a representative capacity. That issue is not before us on appeal.

circuit court. *Burgraff v. Menard, Inc.*, 2016 WI 11, ¶ 20, 367 Wis. 2d 50, 875 N.W.2d 596. The facts in this case are undisputed. Accordingly, the only issue is whether the District was entitled to summary judgment as a matter of law. *See Roth*, 237 Wis. 2d 173, ¶¶ 13–14; Wis. Stat. § 802.08(2).[11]

¶ 14. As in *Roth*, the dispute in this case "centers on the proper interpretation of the collective bargaining agreements" and whether they "vest" in the Retirees' favor a legal right to continuing coverage under the WEAIT group LTC policy. *See Roth*, 237 Wis. 2d 173, ¶ 15. "Interpretation of a collective bargaining agreement, as with other contracts, presents a question of law that we review independently of the determinations rendered by the circuit court . . . ." *Id.* When we interpret a contract, our goal is to ascertain and give effect to the contracting parties' intent. *Id.*

¶ 15. The three CBAs in effect between 1995 and 2001 each provided employees with certain benefits upon early retirement. Section H of Article 16 in each of those CBAs discussed the LTC insurance benefit. Each such provision stated in relevant part:

> An eligible member may continue participation in the District's group health, dental, life . . . and long term care insurance programs subject to the terms and conditions of the carrier until the end of the month in which he/she reaches the age of 65. The cost of the programs to be paid by the District will be adjusted annually to reflect the insurance package in force under the Master Agreement.

---

[11] All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted.

The five CBAs in effect between 2001 and 2011 altered this early retirement provision, capping coverage at "a maximum of ninety-six (96) months" following retirement.

¶ 16. More significantly for our purposes, the CBAs existing between 2001 and 2011 included clear anti-vesting language. These CBAs made an individual's continued participation in the group LTC insurance program subject not only to the carrier's terms and conditions, but also to "any collectively bargained changes in those benefits and programs." The most compelling evidence of the parties' intent not to vest the group LTC coverage benefit, however, is the following anti-vesting provision: "The benefits, premiums and contributions under this Article are established for the term of this collective bargaining agreement and subject to amendment, termination or extension through future collective bargaining."

¶ 17. Despite this language, the Retirees argue they have a vested right to participate in the District's group LTC policy until the Retirees achieved "paid-up" status under the policy or, alternatively, until the District made ninety-six months of group LTC premium contributions for the last early retiree under the 2009–2011 CBA. The Retirees rely primarily on *Roth* for their argument. However, given the language in the relevant CBAs in this case, that decision is of little aid to them.

■

¶ 18. In *Roth*, the municipality and the employee union negotiated a requirement that all retirees pay a portion of their health insurance premiums. *Roth*, 237 Wis. 2d 173, ¶ 8. The premiums had been paid entirely by the municipality under previous

CBAs. *Id.* The retired employees sued for breach of contract, asserting a vested right to fully paid health insurance benefits under the CBAs in force at the time of their respective retirements. *Id.*, ¶ 9. The supreme court, relying on the principle that bargained-for retirement benefits are generally a form of "deferred compensation" and the economic considerations attendant to retirement, adopted the "vesting presumption" articulated in the concurring opinion in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir. 1993) (en banc). *Roth*, 237 Wis. 2d 173, ¶¶ 26–29, 33. Retirement benefits contained in a CBA are presumed to vest "in the absence of contract language or extrinsic evidence indicating an intent against the vesting of retiree health benefits." *Id.*, ¶ 40.

¶ 19. The *Roth* presumption of vested rights "arises out of the CBA in force at the time the employee retires." *Monreal v. City of New Berlin*, 2015 WI App 24, ¶ 11, 361 Wis. 2d 172, 861 N.W.2d 802, *review denied,* 2015 WI 78, 865 N.W.2d 503. The letter of that agreement alone dictates the scope of the vested rights. *Id.*, ¶ 14. The court must interpret the legal language and determine the scope of the covenant the parties formed. *Id.* While "open-ended" promises may provide a basis for finding a vested right, the same is not true when the contract indicates the parties intended a particular provision to be limited in duration. *Id.*, ¶¶ 16–17. "No law or policy in Wisconsin freezes a contract of limited duration in time unless its language calls for that result." *Id.*, ¶ 17.

¶ 20. Here, the only "vesting" that occurred relative to group LTC benefits, if any, concerned the early

retirees under the 1995–2001 CBAs.[12] The CBAs during those time periods stated early retirees could continue participation in the District's group LTC insurance program until the age of sixty-five, subject to the carrier's terms and conditions.[13] CBAs entered into subsequent to the 1999–2001 agreement contained the anti-vesting provision, which stated that each CBA established early retiree benefits only for that specific CBA's term, and that an early retiree's ability to participate in the group LTC insurance program was subject to change, including by termination, based on future collective bargaining action.

¶ 21. The Retirees propose an alternative interpretation of the anti-vesting provision. They argue the parties added the provision merely to inform current employees contemplating retirement that the same early retirement benefits may not be available if they retired under a subsequent CBA.[14] This interpretation fails to account for the principle that we strive for an

---

[12] The District appears to concede the Retirees who retired under the CBAs between 1995 and 2001 had a vested right to participate in the District's group LTC policy and receive premium payments from the District until they reached the age of sixty-five.

[13] It is undisputed that the District satisfied all potential obligations to early retirees relative to LTC insurance benefits under the CBAs in effect between 1995 and 2001. The District not only permitted those early retirees to participate in the group LTC insurance policy until they reached the age of sixty-five., but also paid the full cost of their premiums until that time.

[14] The Retirees cite extrinsic evidence—the testimony of LCEA negotiators—in support of this interpretation. As we explain *infra* ¶ 35, we do not typically resort to extrinsic evidence in the face of clear contract language.

interpretation that does not produce surplus language. *See Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 45, 326 Wis. 2d 300, 786 N.W.2d 15. If the Retirees' preferred interpretation were correct, it would do no more than inform prospective retirees of what is already clear from the provision limiting the term of each CBA to two years.[15] *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 566 (7th Cir. 1995).

---

[15] The Retirees, in their reply brief, rely on *Yolton* for the proposition that language in an agreement limiting its term does not affect retiree benefits. There are two problems with that reliance. First, it appears the contracts at issue in *Yolton* did not include a clear anti-vesting provision. Rather, the provision at issue there was general durational language, which the court stated "only affects *future* retirees—that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA." *Yolton*, 435 F.3d at 581. The District's attempt to impart *Yolton*'s interpretation of general durational language upon the anti-vesting provision in this case is not compelling. To the extent *Yolton* is persuasive in this case, it actually reinforces our conclusion that the Retirees' preferred interpretation of the anti-vesting provision would produce redundancy when considered together with the general durational language of the relevant CBAs.

Second, *Yolton* was rooted in part upon the "inference" that retirement health care benefits are a form of delayed compensation or reward for past services and therefore unlikely to be left to the contingencies of future negotiations. *See Yolton*, 435 F.3d at 580 (quoting *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1481–82 (6th Cir. 1983)). The United States Supreme Court has heavily criticized the Sixth Circuit Court of Appeals for the *Yard-Man* inference, stating that the court's refusal to apply the general durational clause to provisions governing retiree benefits "distort[s] the text of the agreement and conflict[s] with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 936 (2015).

¶ 22. The Retirees charge that the District's interpretation adopts an "implied consent" theory that the supreme court rejected in *Roth*. In *Roth*, our supreme court expressed wariness of employee unions "unilaterally bargain[ing] away contractual promises made to retirees, thereby frustrating the expectations of employees who have earned retirement benefits by providing past services." *Roth*, 237 Wis. 2d 173, ¶ 36; *see also Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 173 (1971) (observing retirees and active employees "plainly do not share a community of interests broad enough to justify inclusion of the retirees in the bargaining unit").

¶ 23. We decline to reverse on this basis here. The potential for conflicts of interest between active and retired employees was a partial justification for the supreme court adopting the *Roth* presumption, but there is no indication the supreme court intended by that discussion to establish a substantive rule providing parties with an avenue for relief from an otherwise clear contract in existence before they retired. Indeed, because the anti-vesting provision existed in the CBAs effective from 2001–2011, the Retirees who retired under those CBAs (which, in this case, is all Retirees other than those who retired under the 1995–2001 CBAs) were expressly told there may come a day when their early retirement benefits would be terminated through collective bargaining, which includes after they retired.[16] Moreover, despite the Retirees' protes-

---

[16] As it pertains to the early retirees under the 1995–2001 CBAs, we again observe that they received what was promised to them (i.e., participation in the District's group LTC insurance program until they reached the age of sixty-five). *See supra* ¶ 20 & n.13. To the extent the Retirees wish to argue

tations regarding active employees "whittling away" retiree benefits, the Retirees' answer to the amended complaint admitted the District's allegation that "[t]he LCEA served as the exclusive bargaining representative for current *and former teachers, including the individually named Defendants.*"[17] (Emphasis added.)

¶ 24. The Retirees also suggest the District's termination of the group LTC policy was unilateral and therefore not in compliance with the CBAs' directive that any changes occur pursuant to collective bargaining. This argument fails to acknowledge that the LCEA and the District *did* agree to the elimination of all postretirement benefits in the new CBA effective July 1, 2011. Because the District had no obligation to continue providing group LTC benefits to the Retirees after this date, it did not act outside the scope of the agreed-to CBA in terminating the WEAIT group LTC insurance policy in 2013. Such conduct was fully consistent with the parties' agreement.

¶ 25. The Retirees insist that reading the CBAs "as a whole" leads to the conclusion the Retirees have a vested right to continuing group LTC coverage.

that the early retirees under these agreements were entitled to something more than the early retirees under the 2001–2011 CBAs, they have failed to craft an argument that clearly separates the two groups. *See Pettit,* 171 Wis. 2d at 646. As far as we can tell, the Retirees' argument is that all early retirees under *all* the relevant CBAs were entitled to coverage under the District's group LTC policy until they reached "paid up" status or the alternative date based on the ninety-six-month provision contained in the 2009–2011 Master Agreement.

[17] Any ambiguity in this admission is eliminated by the Retirees' additional admissions that they were, "[a]t all times material and relevant hereto," both "former employees/retirees of the District" and LCEA members.

Indeed, the Retirees claim the circuit court made a "palpable error" by applying *Monreal* in the face of CBA language that they contend reflects "an intent to vest." It is true that we read a contract as a whole, to avoid the potential for ambiguity that can result if a small part of the agreement is read out of context. *Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, ¶ 20, 326 Wis. 2d 729, 786 N.W.2d 78. However, this principle is of limited use to the Retirees here, as the other contractual provisions to which the Retirees point do not undermine the clear anti-vesting language contained in the 2001–2011 CBAs.

¶ 26. The Retirees highlight two provisions in the relevant CBAs to support their contention. The first is the "language requiring District LTC premium contributions through age 65 or for 96 months post-retirement." Again, to the extent the 1995–2001 CBAs gave rise to a vested right to LTC insurance benefits, it is undisputed the District has performed its obligations by making group LTC insurance coverage available and paying the premiums of retired employees under those agreements until they reached age sixty-five.

¶ 27. The 2001–2011 CBAs, on the other hand, contained language that clearly qualified the retired employee's "right" to participate in group LTC coverage for ninety-six months.[18] The Retirees also gloss over the parties' use of the noun "maximum" when describing the duration of the ninety-six-month LTC insurance benefit. This noun establishes a ceiling beyond which the District's obligations will not extend—a cap of ninety-six months. Conversely, the

---

[18] Still, it is undisputed that there were nine retirees for whom the District did make available group LTC coverage and premium payments for the full ninety-six months.

provision does not contain a floor that obligates the District to offer coverage for the full ninety-six months, which makes sense in light of the CBAs' anti-vesting provision.

¶ 28. The second provision the Retirees claim reflects an intent to vest them with a continuing right to receive WEAIT insurance coverage is a survivorship provision present in the early retirement provision of the CBAs in effect between 2001 and 2011.[19] Between 2001 and 2007, the survivorship provision stated:

> If the retiree dies, any remaining balance of premium contributions . . . will continue to be made on behalf of the surviving spouse and[/]or surviving eligible dependents of the retiree who are covered under the District plans and not enrolled in another group insurance plan. The surviving spouse and/or eligible dependents must pay the balance of unpaid monthly premiums under the same terms and conditions which were applicable to the retiree.

In 2007, the provision was placed in a separate section and expanded to address what was to occur if the insurance carrier refused to allow survivors to continue coverage.

¶ 29. The Retirees fail to explain how the inclusion of the survivorship provision demonstrates the parties' intent to vest group LTC insurance benefits. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Moreover, the provision is fully compatible with non-vesting, as survivorship benefits would be available if, for example, an individual retiree died during the term of the relevant CBA, or

---

[19] Although the Retirees claim the survivorship provision is also present in the CBAs agreed to between 1995 and 2001, we have been unable to locate any such provision in those agreements, including on the record pages the Retirees cite.

during a longer period if the parties chose to carry over the survivorship benefit in subsequent CBAs.

¶ 30. The Retirees appear to acknowledge that nothing in the relevant CBAs explicitly required the District to maintain the group LTC insurance policy until the Retirees received "paid-up" status. Indeed, the term "paid up" is located nowhere within the CBAs. However, the Retirees assert we must consider the terms of the WEAIT group LTC policy in determining if the LCEA and the District intended the early retirees to have vested rights to continuing group LTC insurance coverage. Considering the terms of the policy, the Retirees argue, will show the parties contemplated the early retirees would have a right to participate in the policy until they received "paid-up" status.

¶ 31. As an initial matter, it is not clear the WEAIT group LTC policy was "part" of the relevant CBAs such that it could give rise to a legally enforceable right on the part of the Retirees against the District. The group LTC policy was an agreement between WEAIT and the District. It is true that related documents are usually read together to ascertain the scope of the parties' agreement. *Temme v. Bemis Co.*, 622 F.3d 730, 734 (7th Cir. 2010). The parties may agree to incorporate another document by reference, but a manifestation of mutual assent to this end is necessary. *Mack v. Joint Sch. Dist. No. 3.*, 92 Wis. 2d 476, 492, 285 N.W.2d 604 (1979); *see also Martinson v. Brooks Equip. Leasing, Inc.*, 36 Wis. 2d 209, 217, 152 N.W.2d 849 (1967) (cautioning that unagreed-upon terms inserted in a contract may not be

given force without identification of those terms in the original contract and adoption by the party charged with performance).

¶ 32. The Retirees contend incorporation occurred because the relevant CBAs referenced the specific WEAIT group LTC policy. That identification, however, occurred in the context of the article pertaining to the compensation and benefits for current employees, not early retirement benefits. Moreover, it appears that beginning with the 2001–2003 Master Agreement, the CBAs no longer referenced the specific LTC insurance policy, although they did suggest that the insurer would be "WEA Trust."

¶ 33. The better argument for incorporation is that all relevant CBAs made the availability of LTC insurance benefits for early retirees subject to the carrier's terms and conditions. Even that provision does not get the Retirees very far, as the WEAIT group LTC policy permitted the employer (i.e., the District) to terminate the policy by giving WEAIT advance notice. The Retirees argue that such "termination" clauses are common in insurance policies, and that this particular termination clause was "abrogated by the CBA" because any changes to the early retiree provisions must be collectively bargained.

¶ 34. We reject the Retirees' argument regarding the termination clause because the CBAs' early retirement provisions nowhere limit the District's ability to change insurance carriers. Moreover, the Retirees' argument assumes the WEAIT group LTC policy was, in fact, part of the CBA. The Retirees' argument therefore produces a paradoxical interpretation of the documents—namely, they argue "vesting" occurs under the WEAIT group LTC policy, but the Retirees claim the termination provision contained therein is

ineffective because their right to coverage has "vested" under the CBA. So, we are back to the language of the CBA, which, as we have explained, includes a clear anti-vesting provision.

¶ 35. The Retirees also urge us to follow the concurring opinion in *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015) (Ginsburg, J., concurring). Justice Ginsburg stated: "To determine what the contracting parties intended, a court must examine the entire agreement in light of the relevant industry-specific 'customs, practices, usages, and terminology.' " *Id.* at 937–38 (Ginsburg, J., concurring) (quoted source omitted). The Retirees here fail to identify what relevant "industry-specific" matters shed light on the meaning of the parties' CBAs. Instead, they interpret Justice Ginsburg's observation as an invitation to cite in support of their interpretation all kinds of evidence extrinsic to the CBAs, including the testimony of LCEA negotiators regarding what was told to employees about the bargain the parties were negotiating. This evidence relates to the *parties'* customs and practices, not to the "relevant industry-specific" matters to which Justice Ginsburg was referring. Moreover, we cannot consider these matters unless the contract is ambiguous, which it is not. *See Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W.2d 476 ("Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent.").

¶ 36. We recognize that for the Retirees, "this story does not have a happy ending." *See Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004). It may well be that the LCEA negotiators thought early

retirees would have the ability to continue as policy-holders, even if the District terminated the WEAIT group LTC policy, and expressed that understanding to employees. We doubt neither the sincerity of the Retirees' belief regarding the "vested" nature of their LTC group policy benefits, nor that some have acted upon that belief by continuing to make premium payments in the years following their retirement. The problem is that such belief is not reflected in the CBA language actually collectively bargained for, and our judicial task is limited to ascertaining to what the parties agreed, as reflected primarily in the language of the relevant contracts.

¶ 37. The Retirees' final argument is that even if they do not have a vested right to continue to participate in the WEAIT group LTC policy, the circuit court improperly granted the District summary judgment on their counterclaim for breach of the duty of good faith and fair dealing. The Retirees emphasize that there need not be a technical breach of contract to maintain an action for a breach of the implied duty of good faith and fair dealing. *See Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 794, 541 N.W.2d 203 (Ct. App. 1995). The Retirees contend the District's termination of the WEAIT group LTC policy "eviscerated the spirit of its contract with Retirees and showed a willful failure to perform its end of the bargain after Retirees had met all the requirements entitling them to continued participation in the group LTC plan."

¶ 38. We cannot agree with the Retirees, as a matter of law. In this case, the conduct the Retirees complain of is precisely that which it contends breached the relevant CBAs—i.e., the District's failure to continue the WEAIT group LTC policy until the

690

Retirees were "paid up" or, alternatively, for ninety-six months after the last early retirement under the 2009–2011 Master Agreement. In terminating the policy, the District did no more than that authorized by the 2009–2012 Master Agreement (and earlier CBAs dating back to 2001, by virtue of the anti-vesting provision). As such, the Retirees cannot prevail on their claim for breach of the duty of good faith and fair dealing. *See Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 146 Wis. 2d 568, 577, 431 N.W.2d 721 (Ct. App. 1988) (holding that there can be no breach of the duty of good faith and fair dealing when a party takes actions that are specifically authorized by the agreement).

*By the Court.*—Order affirmed.