COURT OF APPEALS
DECISION
DATED AND FILED

October 15, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2268**

**STATE OF WISCONSIN**

Cir. Ct. No. **2016CV623**

**IN COURT OF APPEALS
DISTRICT IV**

ARROWHEAD SYSTEMS, INC. AND THOMAS J. YOUNG,

  PLAINTIFFS-APPELLANTS,

 V.

GRANT THORNTON LLP AND LAWRENCE M. BOVEE,

  DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Dodge County: JOSEPH G. SCIASCIA, Judge. *Affirmed*.

Before Fitzpatrick, P.J., Blanchard, and Graham, JJ.

¶1      BLANCHARD, J. Arrowhead Systems, Inc., and its sole shareholder, Thomas Young, pursue claims of negligence, breach of fiduciary

duty, and breach of contract against accounting firm Grant Thornton, LLP, and one of its managing directors, Lawrence Bovee.[1] All three of Arrowhead's claims are based on a set of facts that the accountants do not dispute for purposes of summary judgment: at no point over the years that Arrowhead received tax services from the accountants did the accountants alert Arrowhead to a particular tax strategy, causing Arrowhead to miss out on tax savings. Arrowhead also makes an alternative claim of fraud, alleging that accountants intentionally deceived Arrowhead in estimating the net tax savings that Arrowhead would have realized if it had implemented the tax strategy beginning when Arrowhead first retained the accountants.

¶2 The circuit court dismissed all of Arrowhead's claims on summary judgment. It also concluded that Young individually lacks standing to pursue the claims. Arrowhead Systems and Young appeal dismissal. On de novo review we affirm summary judgment in favor of the accountants on all claims.

## BACKGROUND

¶3 The following background is derived from allegations that the parties submitted to the circuit court on summary judgment. Unless otherwise noted, there is no factual dispute between the parties, at least for purposes of summary judgment.

---

[1] We use "Arrowhead Systems" (or, alternatively, "the corporation") and "Young" in references that distinguish between the two, but "Arrowhead" when they make collective arguments or where the distinction does not matter. Similarly, we use "Grant Thornton" and "Bovee" for individual references, but "the accountants" in referring to the collective defendants.

¶4     Young was the chief executive officer of Arrowhead Systems and its sole shareholder. Arrowhead Systems was a corporation that elected to be taxed at all pertinent times under Subchapter S of the Internal Revenue Code, 26 U.S.C.A. §§ 1361-1379. "Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation." *Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001). Thus, all of the income and losses of the corporation passed through to sole shareholder Young and Young paid tax liabilities of the corporation from distributions made to him by the corporation. *See* 26 U.S.C.A. § 1366(a)(1)(A); *see also* *Gitlitz*, 531 U.S. at 209.

¶5     From 2003 to 2014, Arrowhead Systems engaged the accountants to perform tasks related to taxation, with the accountants delivering completed federal and state returns for the last time in August 2013. As discussed below, the parties dispute the scope of tax services that the parties agreed that the accountants would provide. The parties executed annual agreements describing services to be performed by the accountants and the terms under which the services would be rendered.[2]

¶6     Bovee was the accountants' primary point of contact for Arrowhead. Arrowhead would contact the accountants from time to time to ask about particular tax issues.

---

[2] The parties sometimes refer to these annual agreements between Arrowhead Systems and the accountants as "engagement letters," but we use the phrase "annual agreements." As we discuss in an additional background section below, the annual agreements were defined in the annual agreements as consisting of two component documents, or at the option of the parties possibly three component documents: (1) an engagement letter and (2) an Attachment A accompanying each letter, plus possibly (3) a one or more Statements of Work. As it happened, the parties' annual agreements each year consisted of all three documents.

¶7 Arrowhead Systems' businesses included the international export of equipment. Before 2013, the accountants did not recommend to Arrowhead, and Arrowhead never asked the accountants about, potential tax benefits for U.S. exporters such as Arrowhead that could be achieved through a particular tax avoidance strategy ("the tax strategy"). The tax strategy required international exporters to create a corporate vehicle called an Interest Charge Domestic International Sales Corporation. It was not until October 2013 that Arrowhead learned of the tax strategy, and this was from a source other than the accountants.

¶8 The parties do not dispute any aspect of the requirements to qualify for benefits under the tax strategy. All that is important to our discussion are the following undisputed facts. First, if an exporter timely implemented the tax strategy, the exporter was allowed to pay lower rates on some income for the tax years in which it was in place. Second, as a matter of tax law, exporters cannot retroactively claim the benefit of the tax strategy. That is, exporters have to timely create specific corporate vehicles to take advantage of the strategy, which Arrowhead had not done before 2013.

¶9 After Arrowhead independently learned of the tax strategy, Young asked the accountants to estimate the net tax savings that Arrowhead Systems would have realized if it had implemented the tax strategy over the years that it received tax services from the accountants. The parties dispute various aspects of the steps that the accountants took after receiving this request. However, they agree that in February 2014 Bovee sent Young an email attaching a statement

estimating that Arrowhead Systems would have realized approximately $124,500 in net savings if it had implemented the tax strategy starting in 2003.[3]

¶10    Arrowhead Systems began to implement the tax strategy in November 2013.

¶11    Arrowhead's amended complaint alleges that the accountants were negligent, breached a fiduciary duty, and breached a series of contracts in the course of its relationship with Arrowhead, all based on the fact that the accountants did not recommend the tax strategy to Arrowhead before Arrowhead independently discovered it in late 2013.

¶12    Arrowhead separately alleges that the accountants committed fraud. The fraud allegation was that the accountants provided Arrowhead Systems with an estimate of unrealized net tax savings as a result of not implementing the tax strategy that the accountants knew was lower than the actual net savings that could have been achieved. The accountants minimized the actual unrealized net tax savings, according to Arrowhead, with the intent of dissuading Arrowhead from pursuing claims against the accountants in court.

¶13    The accountants moved for summary judgment and Arrowhead opposed the motion. In an extensive written decision, the circuit court made a series of rulings that resulted in summary judgment against Arrowhead Systems and Young on all claims. This included the court's conclusion that, based on a choice of law provision in the annual agreements, Arrowhead Systems' claims of

---

[3] Stated more completely, the accountants' estimate was that there would have been tax savings of approximately $310,000, but that costs associated with implementing the tax strategy would have brought net tax savings down to approximately $124,500.

negligence, breach of fiduciary duty, and breach of contract are barred by a two-year Illinois statute of limitations. The court further concluded that Young lacks standing to bring direct claims against the accountants for providing inadequate tax service to Arrowhead Systems. Arrowhead Systems and Young appeal.

## DISCUSSION

¶14    We conclude that (1) the annual agreements between Arrowhead Systems and the accountants govern the claims by Arrowhead Systems; (2) Arrowhead Systems' claims are barred by an Illinois two-year limitations period contained in the annual agreements, and that the limitations period was not tolled under the doctrines of fraudulent concealment or equitable estoppel;[4] (3) Arrowhead disavowed in the circuit court that it was making an independent fraud claim and therefore cannot pursue it going forward; and (4) Young lacks standing to pursue any of the claims, which belong to Arrowhead Systems, despite the fact that he was the sole shareholder and the corporation had elected to adopt the Subchapter S flow-through taxation feature. The following legal standards and standards of review are applicable to multiple issues.

¶15    We review a grant of summary judgment independently of the determinations of the circuit court, but we apply the same methodology. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315-17, 401 N.W.2d 816 (1987). Summary judgment is appropriate when there is no genuine dispute of material

---

[4] To clarify, the disputes on the first two issues are strictly between the only parties to the annual agreements—Arrowhead Systems and the accountants—and not Young, who was not a party to the agreements.

fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2017-18).[5]

¶16 Contract interpretation presents a question of law that we review de novo. *Marx v. Morris*, 2019 WI 34, ¶20, 386 Wis. 2d 122, 925 N.W.2d 112.

¶17 "[W]e interpret the plain language of a contract 'consistent with what a reasonable person would understand the words to mean under the circumstances.'" *Id.*, ¶63 (quoted source omitted). When contract terms "'are clear and unambiguous, we construe the contract according to its literal terms.'" *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶23, 326 Wis. 2d 300, 786 N.W.2d 15 (quoted source omitted).

¶18 Because we conclude that the contract language here is not ambiguous on any issue that we address, we have no need to resort to either of two aids to interpretation that can be used when a court is faced with ambiguous language: evidence extrinsic to the contract itself, to determine the intent of the parties; or, the rule that ambiguous language is to be interpreted against the drafter (here, the accountants). *See id.*

## I. SCOPE OF ANNUAL AGREEMENTS

¶19 The parties dispute whether the scope of the annual agreements is broad enough to govern all tax services that the accountants provided (or failed to provide) to Arrowhead Systems in a given year, or instead the scope of the annual agreements was limited to the subset of tax services that are specifically set forth

---

[5] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

in Statements of Work that were part of each annual agreement. This is important because the annual agreements contain a choice of law provision that we conclude is dispositive.

¶20 Arrowhead Systems contends that the terms in the annual agreements do not govern this dispute because the agreements limited the scope of the accountants' obligations exclusively to preparing federal and state tax returns, which would not include the tax service of providing advice on potential tax strategies. This argument rests on the proposition that the only set of obligations covered by the terms of the annual agreements that the accountants could have had to the corporation were those detailed in Statements of Work.

¶21 In contrast, the accountants argue that the terms of the annual agreements govern this dispute because the agreements stated that the accountants would provide "tax services" to Arrowhead Systems, including "all [s]ervices rendered whether or not the parties execute a [s]tatement of [w]ork," which would include the tax service of alerting Arrowhead Systems to the tax strategy.

¶22 We now provide additional background facts and then explain why we agree with the accountants' interpretation.

**A. Additional Background**

¶23 Each annual agreement consisted of the following component documents: an engagement letter, an Attachment A to the letter, and a Statement of Work.[6] We now describe each document.

_____

[6] Arrowhead Systems acknowledges that, from year to year, there was only "minor variation" in the language of these documents, and that any variations do "not change the
(continued)

¶24 **Engagement letter**. The two-page letter stated that Grant Thornton was to "provide tax services (the "Services")" to Arrowhead Systems. It also stated that the agreement formed by "this letter, Attachment A, and any related Statement(s) of Work" would "confirm the scope and terms of our engagement."

¶25 The letter further provided in pertinent part:

> The Services we provide to you under this Agreement typically will be set forth in distinct Statements of Work signed by you … specifying matters including scope, deliverables, timing, fees and payment terms. From time to time we may perform in the course of our relationship Services without a Statement of Work. This Agreement will cover all Services rendered whether or not the parties execute a Statement of Work.

¶26 The accountants committed in the letter to perform the "Services" in accordance with identified professional standards.

¶27 **Attachment A**. The five-page Attachment A addressed such topics as the required participation and responsibilities of Arrowhead Systems in the relationship.[7] It included the following passage, which referred to "matters" for

---

analysis." For ease of reference we quote representative language from the December 2009 annual agreement, and refer to the agreements' component documents in the singular (*e.g.*, "the engagement letter").

On a related note, Arrowhead takes the factual position that the parties entered into annual agreements only between 2007 and 2012, but neither side contends that the alleged absence of agreements before 2007 changes the analysis on any issue that we address.

[7] These Attachment A topics included, favoring the accountants, a "Limitation on Period to File Claims" of two years and a "Limitation of Liability." Given our dispositive rulings on other issues, however, we need not reach the disputes between the parties on the potential applicability of these provisions.

(continued)

which Arrowhead Systems was engaging the accountants as being those "covered in the Agreement," not as being those covered in any Statement of Work:

> Our conclusions are limited solely to the matters for which we were engaged. No conclusions should be inferred as to any matters not specifically covered in the Agreement. Further, the conclusions are based upon the facts and information presented by you and may be inapplicable if the actual facts differ from those presented in any respect.

In addition, Attachment A provided that "[a]ny capitalized terms in this Attachment A that are not defined shall have the meanings in the letter," which would include the term "Services."

¶28 **Statement of Work**. The two-page Statement of Work (including an addendum, listing types of returns to be completed) stated that its purpose was "to describe the scope of services ("Services")" that Arrowhead Systems was "requesting Grant Thornton to perform, and to set forth the agreed fee, timing and other matters related to the Services."

¶29 The Statement of Work further provided:

> The Services we will provide to you for the taxable year ended [specified tax year stated here] include the following specific deliverables, as detailed below or as set forth in the Addendum to this Statement of Work ….
>
> - Preparation of federal and state tax returns
>
> - Preparation of federal and state extension calculations and applicable forms.

---

While on this subject, we note that we need not address whether a two-year Florida statute of limitations could apply here based on Young's Florida residency. Nor do we need to address the accountants' alternative argument that any individual claim by Young would be time-barred under Florida's statute of limitations because his claims would be "foreign" under Wisconsin's borrowing statute, WIS. STAT. § 893.07.

**B.    Analysis**

¶30    We agree with the accountants that the annual agreements define the "Services" that the accountants would provide to Arrowhead Systems as being "tax services" generally, without qualification.  There is no other definition of "Services" that applied and there were multiple references in the annual agreements that support this interpretation.  Further, this defined term, "Services" was used throughout the annual agreement.  We disagree with Arrowhead's counter argument, which is that the "Services" were limited to the specific "deliverables" described in each Statement of Work.  We now explain our conclusions further, based on a plain language interpretation of the annual agreement.[8]

¶31    No doubt the expressed choice of the parties to define the "Services" using the broad phrase "tax services" created a wide field of potential responsibility for the accountants.  But breadth in a contract term, even great breadth, does not necessarily indicate ambiguity.  *See **Mattheis v. Heritage Mut. Ins. Co.***, 169 Wis. 2d 716, 722, 487 N.W.2d 52 (Ct. App. 1992).  As we stated in ***Mattheis***, a contract term "is not ambiguous merely because it is general enough to encompass more than one option," because parties may elect to use "[b]road terms" in order "to permit flexibility in the choice of methods available without creating an ambiguity."  ***Id.***  Here, Arrowhead Systems fails to point to other language in the annual agreements that would undermine the conclusion that the

---

[8] Arrowhead Systems alludes to expert testimony interpreting the annual agreements and to a particular argument made by the accountants in the circuit court, but it fails to develop an argument based on legal authority that either of these could be pertinent to our task of de novo interpretation under the contract interpretation standards we have summarized above.

parties intended to create a wide field of potential tasks by the accountants in defining the "Services" as "tax services" without qualification. Further, the intention of the parties was clear from multiple references in the annual agreements, including the following.

¶32 The engagement letter provided: "This Agreement will cover all Services rendered whether or not the parties execute a Statement of Work." This made clear that the parties contemplated that the "Services" were *not* exclusively those tasks defined in a Statement of Work, as Arrowhead Systems contends. As the accountants point out, Arrowhead Systems' argument that the only set of obligations that the accountants could have had to the corporation were those detailed in Statements of Work is problematic because it would render this provision superfluous. *See Ash Park LLC v. Alexander and Bishop Ltd.*, 2015 WI 65, ¶37, 363 Wis. 2d 699, 866 N.W.2d 679 ("Interpretations that give reasonable meaning to each provision in the contract are preferred over interpretations that render a portion of the contract superfluous.").

¶33 The engagement letter established that use of "any" Statement of Work was merely an optional means of defining particular obligations. In the same vein, the engagement letter provided that a Statement of Work would "typically" be used, meaning that it did not need to be used. Consistent with that idea, the letter specified that, "[f]rom time to time," the accountants "may perform in the course of our relationship Services without a Statement of Work." For these reasons, the letter reflected an agreement that the "Services" defined in the letter could exceed in scope any specific tasks that might be specified in a Statement of Work. Arrowhead Systems apparently invites us to ignore this language in the annual agreements because the parties included a Statement of Work in each of the annual agreements, which rendered this language merely "hypothetical." We fail

to see any basis for this position under the standards that we apply to the interpretation of contracts.

¶34 Terms in the Statement of Work itself provided further indicia that any Statement of Work included in any annual agreement provided a floor, and not a ceiling, on the potential scope of "Services." First, the Statement of Work provided that "The Services we will provide to you for the taxable year ended [specified tax year stated here] *include* the following specific deliverables," which suggests that the Statement of Work was not an exclusive list of all "Services." (Emphasis added.) Second, the Statement of Work provided that it "does not modify or amend" the agreement created by the engagement letter and Attachment A. Together, these terms limited the scope of any Statement of Work that the parties might decide to include in any annual agreement to addressing the obligation of the accountants to produce specific "deliverables" listed within the Statement of Work, thus leaving unqualified the broad definition of "Services" as tax services created by the engagement letter and used in the attachment.

¶35 It is true that the Statement of Work provided that it "does not include, for example, studies, … or research or consultation with respect to nonrecurring items or other matters of tax significance that may arise in the course of tax return preparation or during the course of the year," and then explained that in that event "such items arise or you request additional Services we will provide you a fee estimate and a new Statement of Work before we invest significant professional time." Viewed strictly in isolation, this language could suggest that *all* work by the accountants had to be detailed in a Statement of Work. However, we interpret specific contract language in the context of the contract as a whole.

*Little Chute Area Sch. Dist. v. Wisconsin Educ. Ass'n Council*, 2017 WI App 11, ¶25, 373 Wis. 2d 668, 892 N.W.2d 312.[9]  Read in the context of all of the language that we cite above, the only reasonable interpretation of this language is that the accountants were agreeing that in general ("for example") they would create Statements of Work to match "nonrecurring items or other matters of tax significance," but that the accountants may provide "Services" not detailed in any Statement of Work.

¶36     Along similar lines, given the other provisions, it does Arrowhead Systems no good to emphasize in support of its argument the following sentence from the Statement of Work:  "The purpose of this Statement of Work is to describe the scope of services ("Services") [Arrowhead Systems] is requesting [the accountants] to perform, and to set forth the agreed fee, timing and other matters related to the Services."  Read in the context of other provisions in the annual agreement that we have highlighted, this simply meant that producing the particular, limited set of "deliverables" listed in the Statement of Work was the only set of obligations required of the accountants *by the Statement of Work itself*. Thus, for example, the Statement of Work gave an estimate for fees for the production of the deliverables, which is a statement-of-work-specific provision.

---

[9] Elaborating on this point, we note that there are two potential sides to the equation. Particular contract language that is seemingly clear may be understood to be ambiguous when considered in the context of the contract as a whole.  *See Folkman v. Quamme*, 2003 WI 116, ¶19, 264 Wis. 2d 617, 665 N.W.2d 857.  By the same token, however, seeming ambiguity in particular contract language may be shown to be clear when the contract as a whole is considered. *See id.*, ¶21; *Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, ¶¶20, 32, 326 Wis. 2d 729, 786 N.W.2d 78.  In this instance, Arrowhead Systems makes an argument focused on particular language that ignores context provided by other language in the contract.

¶37    Arrowhead Systems argues that if the "tax services" interpretation of the annual agreement were correct "there would be no reason to enter into multiple engagement letters." Assuming without deciding that this argument could assist in interpreting the annual agreement, it ignores the obvious value to the parties of being able to specify particular deliverables to be produced in any given year and to review and discuss the agreements in general on a periodic basis. Further, stepping back, we review the agreements that the parties in fact entered into; it is irrelevant whether the parties could have structured their relationship in different ways, including ways that Arrowhead Systems might now suggest would have been more optimal with the benefit of hindsight.

¶38    Arrowhead Systems misinterprets the sentence in the engagement letter which provided that the annual agreement formed by "this letter, Attachment A, and any related Statement(s) of Work" would "confirm the scope and terms of our engagement." Arrowhead Systems may intend to interpret this sentence to mean that the "scope" of "engagement" could not go beyond the deliverables listed in any Statement of Work in a way that limits the otherwise broad definition of "Services" as "tax services." But that is not a reasonable interpretation in light of the other provisions we have highlighted. Instead, the only reasonable interpretation is that the scope of "Services" would be defined by the engagement letter, with the entire annual agreement providing context for how the parties would address particular deliverables listed in any Statement of Work.

¶39    Arrowhead Systems states,

> [j]ust because Grant Thornton may provide other services that come within the definition of Services without a separate statement of work does not mean that everything Grant Thornton could have been asked to do at any point falls within the definition of Services and is covered by the Engagement Letters.

15

We interpret this as an argument that the annual agreement could not encompass all "tax services" that the accountants could provide, but that it had to be more specific. This argument merely returns us to our original point that parties are permitted to enter into contracts that create broad obligations.

¶40 On a related point, we note that Arrowhead Systems fails to develop an argument contrary to the accountants' contention on appeal that, if the annual agreements applied to all tax services, then that would have included providing advice about the tax strategy in particular. As the accountants argued the point to the circuit court: "What the [p]laintiffs are complaining here is [that] the people who provided tax services didn't recommend a tax service." Arrowhead Systems concedes the issue by failing to reply to the accountants' argument. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (failure to refute proposition asserted in response brief may be taken as concession).[10]

¶41 Finally regarding the scope of the annual agreements, we note two phrases in the choice of laws provision in the engagement letter, a provision that we discuss in more detail in the following section of this opinion. We now italicize the two pertinent phrases here:

> This Agreement, including its formation and the parties' respective rights and duties and *all disputes* that might arise from or in connection with this Agreement *or its subject matter*, shall be governed by and construed in

---

[10] On a related note, given other decisions we explain in this opinion, we need not address an alternative legal theory that the accountants offer to affirm the circuit court, namely, that if giving unsolicited tax advice about the tax strategy was beyond the scope of the annual agreement, then Arrowhead Systems could not prevail because there was no evidence of a separate agreement to provide this type of advice.

> accordance with the laws of Illinois, without giving effect
> to conflicts of laws rules.

(Emphasis added.) It supports our interpretation of the annual agreement that the parties included this very broad language in the choice of laws provision. They reached out to include "all disputes" arising from the "subject matter" of the agreement and did not, for example, limit this provision to the resolution of disputes involving deliverables listed on any Statement of Work.

¶42 For these reasons, we conclude that all tax services provided by the accountants fall within the scope of the annual agreements, and accordingly the accountants' failure to provide advice regarding the tax strategy is governed by the terms of those agreements.

## II.     STATUTE OF LIMITATIONS

¶43 We turn to the accountants' contentions that a choice of law provision in the annual agreement dictates the application of Illinois law to disputes between the parties, and that, applying Illinois law, the claims of Arrowhead Systems are time-barred under a two-year statute of limitations.[11] In this context, Arrowhead Systems renews arguments that we have already rejected above related to the scope of the annual agreement. Putting those arguments to the side, we do not discern any new argument by Arrowhead Systems either that Illinois law does not govern under the choice of law provision or that the correct statute under Illinois law is not the one cited by the accountants.

---

[11] As with the first issue addressed above, the dispute on the second issue is strictly between the only parties to the annual agreements—Arrowhead Systems and the accountants—and not Young.

17

¶44     What remains is Arrowhead Systems' argument that the statute of limitations was tolled due to fraudulent concealment by the accountants under 735 ILL. COMP. STAT. 5/13-215 or due to the closely related common law doctrine of equitable estoppel.[12]     More specifically, Arrowhead Systems contends that the accountants cannot assert the two-year Illinois limitations defense because Arrowhead Systems reasonably relied on false representations made by the accountants that prevented Arrowhead Systems from understanding the full scope of its net tax losses.     In response, the accountants argue that fraudulent concealment/equitable estoppel does not apply on these facts.     We agree with the accountants on this issue.

¶45     We now provide additional background and then explain why we agree with the accountants on this disputed issue of Illinois law.

**A.     Additional Background**

¶46     As to the choice of laws issue, as partially quoted above, the engagement letter provided in pertinent part:

> This Agreement, including its formation and the parties' respective rights and duties and all disputes that might arise from or in connection with this Agreement or its subject matter, shall be governed by and construed in

---

[12] The arguments of the parties sometimes merge the two doctrines and we sometimes refer to them collectively, which is consistent with Illinois law.  "Although case law developed the doctrine of equitable estoppel and the legislature promulgated fraudulent concealment, the principles behind the two are substantively the same."  *Turner v. Nama*, 689 N.E.2d 303, 308 (Ill. App. Ct. 1997).  But in our discussion we attempt to preserve any reliance by a party on one doctrine.

Separately, given our determination that Illinois law applies, we do not address Arrowhead Systems' several references in its appellate briefing to non-Illinois law on the fraudulent concealment/equitable estoppel issue, such as case law from Wisconsin, California, or Florida.

accordance with the laws of Illinois, without giving effect to conflicts of laws rules. The parties consent to the personal jurisdiction of the courts of the state where the Grant Thornton office performing the Services is located …, and the parties waive objection to venue ….

¶47 Arrowhead Systems does not dispute that the Illinois statute of limitations cited by the accountants, a two-year statute of limitations for all claims against accountants and their firms, would apply here, absent fraudulent concealment/equitable estoppel.[13] The statute of limitations provides:

> Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended, or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within 2 years from the time the person bringing an action knew or should reasonably have known of such act or omission.

735 ILL. COMP. STAT. 5/13-214.2.(a) (1991). We pause to note that this incorporates a "discovery rule," which delays the commencement of the two-year statutory period until the potential plaintiff "knew or should reasonably have known of such act or omission." *See **Brummel v. Grossman***, 2018 IL App (1st) 162540, ¶26, 103 N.E.3d 398 (using phrase "'discovery rule'") (quoting ***Romano v. Morrisroe***, 759 N.E.2d 611, 613 (Ill. App. Ct. 2001)).

¶48 The following are additional undisputed facts regarding Arrowhead's discovery of the alleged omission by the accountants. Arrowhead asked the accountants in December 2013 to tell Arrowhead what net savings the

---

[13] Arrowhead Systems also does not dispute that under Illinois law, while the issue of when a limitations period begins is generally one of fact, it becomes an issue of law for the court to decide if the relevant facts are undisputed. *See **Witherell v. Weimer***, 421 N.E.2d 869, 874 (Ill. 1981).

corporation would have achieved if it had implemented the tax strategy. Young acknowledged in deposition testimony that he made this request "[b]ecause I wanted to see what the damage was by the negligence of Grant Thornton." Similarly, Young averred in this litigation that, after he learned in the fall of 2013 that the accountants had failed to recommend the tax strategy, "I was understandably upset and frustrated with Mr. Bovee and his incompetence." On February 24, 2014, the accountants provided its analysis estimating lost tax savings.

¶49     Well over two years after the accountants provided this analysis, on December 14, 2016, Arrowhead commenced this action. However, the accountants do not dispute that they do not have a defense based on the Illinois statute of limitations if the Illinois fraudulent concealment statute or the doctrine of equitable estoppel applies to toll operation of the statute of limitations for a significant fraction of the period from February 2014 to December 2016.

¶50     The fraudulent concealment statute provides:

> If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards.

735 ILL. COMP. STAT. 5/13-215 (1982).

¶51     As to equitable estoppel,

> A defendant is estopped from asserting the limitations bar if the plaintiff's failure to act within the statutory period results from reasonable reliance on the defendant's conduct or representations. "To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other party misrepresented or

> concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel has been prejudiced by his or her reliance on the representations."

*Brummel*, 103 N.E.3d 398, ¶36 (citations omitted).

### B. Analysis

¶52 With that additional background, Arrowhead Systems makes the following fraudulent concealment/equitable estoppel argument. It does not dispute that the applicable Illinois statute of limitations would have otherwise been triggered under the discovery rule no later than February 2014, which is when the accountants provided their estimate of tax losses. But it contends that its complaint was timely filed nearly three years later because the statute of limitations should be deemed tolled as of February 2014, when the accountants provided Arrowhead with a "fraudulently altered analysis" of tax losses. The corporation argues that it could prove that the accountants intentionally gave it a phony estimate, strategically aiming for a number somewhere below "a reasonable estimate of the cost of litigation against a large accounting firm." According to Arrowhead Systems, it was only after the corporation began using the tax strategy, and realized "two years of successively larger tax savings" generated by the strategy, that it had "a basis to believe [that the accountants'] representation had been false."

¶53 We put to one side the accountants' arguments that there is no proof of a scheme to provide an artificially low estimate. Even assuming the truth of the

21

concealment allegations, the accountants contend in part that neither fraudulent concealment nor equitable estoppel could apply. They argue that this is because, on the undisputed facts, no later than February 2014 Arrowhead Systems knew or should reasonably have known that it had a legally cognizable injury, with potential damages. We agree with the accountants that this is the legal standard in Illinois and that it applies here on the undisputed facts to defeat the exception to the statute of limitations sought by Arrowhead Systems.

¶54    In Illinois, a plaintiff may potentially avoid the effect of a statute of limitations when the plaintiff is uncertain regarding "'the fact of damage' but not where uncertainty exists only as to the amount of damage." *See Brummel*, 103 N.E.3d 398, ¶31 (quoting *Belden v. Emmerman*, 560 N.E.2d 1180, 1183 (Ill. App. Ct. 1990) (in turn quoting *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 557 N.E.2d 525, 528 (Ill. App. Ct. 1990), *rev'd on other grounds*, 633 N.E.2d 627 (1994)). The accountants note that the Illinois Supreme Court has stated the same point in the following way:

> This court has never suggested that plaintiffs must know the full extent of their injuries before the statute of limitations is triggered. Rather, our cases adhere to the general rule that the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries. *See Hyon Waste Management Services, Inc. v. City of Chicago* (1991), 214 Ill.App.3d 757, 762-63, 158 Ill. Dec. 335, 574 N.E.2d 129 ("the mere fact that the extent of its damages is not immediately ascertainable does not postpone the accrual of a plaintiff's claim"); *Swider v. Holy Cross Hospital* (1986), 146 Ill.App.3d 740, 742, 100 Ill. Dec. 496, 497 N.E.2d 474.

*Golla v. General Motors Corp.*, 657 N.E.2d 894, 899-00 (Ill. 1995); *see also McDaniel v. La Salle Ambulance Serv., Inc.*, 440 N.E.2d 158, 160 (Ill. App. Ct. 1982) (stating that a "mere misrepresentation of a fact does not constitute

fraudulent concealment in absence of a showing that it tended to conceal the cause of action," so that, for example, "[a] contention that defendant concealed the identity of a wrongdoer rather than the cause of action does not constitute fraudulent concealment").[14]

¶55    Here, the only uncertainty alleged by Arrowhead Systems was the extent of damage.  The existence of damage is, of course, an element of a cause of action.  But Arrowhead Systems does not argue that the accountants denied the existence of damage.   Indeed, it is undisputed that the accountants gave Arrowhead Systems an analysis estimating the tax savings loss to be approximately $124,500, which is not a mere de minimis sum.

¶56    We note that the Illinois rule reflected in *Brummel*, *Golla*, and *McDaniel* is consistent with the statutory language in 735 ILL. COMP. STAT. 5/13-215 ("fraudulently conceals *the cause of such action*" (emphasis added)).  Further, Arrowhead Systems does not identify, and we do not discern, in Illinois law an exception to the Illinois rule for the situation in which the plaintiff alleges, as Arrowhead Systems does here, that the defendant concealed damages with the specific purpose of falsely making the value of potential litigation appear cost prohibitive.

¶57    Arrowhead Systems also quotes the following passage in *Brummel*, which we have also quoted above and which does nothing to undermine our

---

[14] Arrowhead Systems quotes, clearly out of context, one passage from *Smith v. Cook County Hospital*, 518 N.E.2d 336, 340 (Ill. App. Ct. 1987).  Arrowhead Systems leaves out the following statement, which followed the passage it quotes:   "Moreover, fraudulent misrepresentations which constitute the basis of the claim do not amount to fraudulent concealment unless these actions tended to conceal the cause of action."  *See id.*

interpretation of Illinois law: "A defendant is estopped from asserting the limitations bar if the plaintiff's failure to act within the statutory period results from reasonable reliance on the defendant's conduct or representations." Under the logic of *Brummel*'s rule that the mere "amount of damage" does not count in this context, it could not have been reasonable for Arrowhead Systems to rely on the estimate of loss provided by the accountants in deciding whether it had a cause of action against the accountants.

¶58    In its reply brief, Arrowhead Systems relies on an Illinois court decision that recognizes a special situation in which a defendant may be equitably estopped from asserting a limitations defense even when the plaintiff has sufficient information regarding a potential cause of action against the defendant. The special situation occurs when a defendant engages in fraudulent settlement negotiations for the purpose of lulling the plaintiff into believing that there is no need to pursue a legal cause of action until it is too late to do so. *See Mitchell v. State Farm Fire & Cas. Co.*, 796 N.E.2d 617, 621 (Ill. App. Ct. 2003) (insurance company equitably estopped from asserting statute of limitations defense because, just before limitations period ran, it intentionally lulled insured into failing to commence suit by expressing a willingness to reconsider denial of coverage, accompanied by a request for more information). *Mitchell* addresses the use of a devious settlement tactic that is different in kind from what is alleged here. *Id.* Again, here the only argument is that the accountants misled Arrowhead Systems in estimating the extent of potential damages.

¶59 In sum, fraudulent concealment/equitable estoppel do not provide a basis here to toll the Illinois statute of limitations.[15] Therefore Arrowhead Systems' claims of negligence against the accountants are time barred under Illinois law.

## III. INDEPENDENT FRAUD CLAIM

¶60 Arrowhead argues that, if the two-year Illinois statute of limitations applies despite its allegation of fraudulent concealment, this means that Arrowhead must have a viable, independent common law fraud claim under Wisconsin law by operation of Article I, § 9 of the Wisconsin Constitution.[16] The argument is apparently that the same allegations that would support an exception to the statute of limitations would support an independent claim of fraud, and under Article I, § 9 this court is obligated to remand to allow Arrowhead to pursue the fraud claim.

---

[15] Further, as a general matter, fraudulent concealment cannot provide Arrowhead with a separate cause of action. *See Wisniewski v. Diocese of Belleville*, 943 N.E.2d 43, 72-73 (Ill. App. Ct. 2011) (fraudulent concealment is not a separate cause of action but rather an exception to a statute of limitations that would otherwise bar some other, underlying cause of action).

Separately, we note that we have no need to address the accountants' alternative argument that Arrowhead Systems failed to adduce evidence that it exercised ordinary diligence to discover the amount of its damage.

[16] Article I, § 9 of the Wisconsin Constitution provides:

> Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obligated to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

This constitutional provision guarantees a litigant's access to the courts to attempt to enforce an existing legal right, but it does not create any new legal rights. *See Aicher v. Wisconsin Patients Comp. Fund*, 2000 WI 98, ¶43, 237 Wis. 2d 99, 613 N.W.2d 849.

¶61    We reject this argument because, after the accountants argue on appeal that Arrowhead stated in the circuit court that it was not making an independent fraud claim, Arrowhead concedes the point by failing to reply to the argument.  *See United Coop.*, 304 Wis. 2d 750, ¶39 (failure to refute proposition asserted in response brief may be taken as concession).  Arrowhead must be held to the litigation choices that it made in the circuit court, including any waivers or forfeitures.

## IV.    YOUNG'S STANDING

¶62    As a general rule, a corporation's shareholders do not have standing to bring a direct claim seeking redress for an injury to the corporation, but instead the claim for an injury to a corporation belongs to the corporation itself.  *See Rose v. Schantz*, 56 Wis. 2d 222, 228-29, 201 N.W.2d 593 (1972).  The circuit court invoked this principle, which we refer to as the shareholder-standing rule, and dismissed Young's claims against the accountants for lack of standing.

¶63    Young argues that, as the sole shareholder of the Subchapter S corporation who claims harm from the accountants' failure to recommend the tax strategy, he has standing to pursue the same claims as Arrowhead Systems against the accountants.  The accountants argue that Young does not have standing because all claims based on failure to recommend the tax strategy belong solely to Arrowhead Systems, the injured party, and not to Young, who claims mere indirect injury.  We agree with the accountants.  The direct injury is to the corporation; Young's only individual injury, while predictable as a result of the corporation's injury, results from the corporation's injury.  *See id.* at 229 ("So the question to be asked is, Whose right is sought to be enforced by the … cause of action?"); *Park Bank v. Westburg*, 2013 WI 57, ¶43, 348 Wis. 2d 409, 832

N.W.2d 539 (claim is derivative when individual plaintiff's injury results from the corporation's injury).

¶64    We rely on Wisconsin law to resolve this issue, as influenced by persuasive authority, because Young was not a party to the annual agreements that required application of Illinois law.[17]

¶65    Standing disputes present issues of law that we review independently of the determinations of the circuit court. ***Park Bank***, 348 Wis. 2d 409, ¶37.

¶66    The parties agree that the issue here is whether, on the undisputed relevant facts, the shareholder-standing rule involving "direct injury" applies. To repeat, "[i]f the only direct injury is to the corporation, then the right to bring the action belongs solely to the corporation." ***Ewer v. Lake Arrowhead Ass'n***, 2012 WI App 64, ¶17, 342 Wis. 2d 194, 817 N.W.2d 465 (citing ***Rose***, 56 Wis. 2d at 229). "This is true even though the direct injury to the corporation 'may have a subsequent impact on the stockholders' shares.'" ***Id.***, ¶17 (quoting ***Rose*** 56 Wis. 2d at 229). Such a stockholder injury "is secondary to the injury to the corporation, which is the primary injury." ***Id.*** (citing ***Rose*** 56 Wis. 2d at 229).

---

[17] We reject a tardy forfeiture argument made by Young on the standing issue. In his principal brief, Young criticizes the accountants for their timing in raising the standing argument in circuit court, but he does not raise a forfeiture issue. For the first time in his reply brief, Young argues that the accountants "waived and now impermissibly challenge" Young's standing. We reject this argument because Young raises it for the first time in the reply brief. *See **A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (we generally decline to consider arguments raised for the first time in a reply brief because the alternative would typically be "inherently unfair"). We also observe that—putting aside Young's misuse of the word "waiver" for the correct term in this context, "forfeiture"—the forfeiture argument is meritless. The record reflects that the circuit court patiently gave both sides full opportunities to explore the standing issue in a thoughtful colloquy at a hearing on June 26, 2019, which they took advantage of, and that there is no suggestion that the court prevented Young from a full opportunity to submit any pleadings on the standing issue at any time. Further, the court made clear that it believed that the issue had been squarely raised and the court explained its reasoning.

The rationale behind the shareholder-standing rule is that "'[r]ights of action accruing to a corporation belong to the corporation, and an action at law or in equity, cannot be maintained by the members as individuals.'" *Rose*, 56 Wis. 2d at 229 (quoting *Marshfield Clinic v. Doege*, 269 Wis. 519, 526, 69 N.W.2d 558, (1955), relying in part on *Button v. Hoffman*, 61 Wis. 20, 20 N.W. 667 (1884)).

¶67 The focus of the direct injury issue is whether the claim is to protect corporate assets. "Generally, a derivative claim is one that 'a corporation could bring because the corporation's assets are affected.'" *Park Bank*, 348 Wis. 2d 409, ¶41 (quoting *Borne v. Gonstead Advanced Techs., Inc.*, 2003 WI App 135, ¶15, 266 Wis. 2d 253, 667 N.W.2d 709). "In contrast, a direct action [by a shareholder-plaintiff] is an action seeking a judgment awarding damages to the plaintiff individually due to injuries that the plaintiff individually suffered," and "the complaining plaintiff individually recovers damages." *Id.*, ¶40 n.6. Under this approach, when "an individual's injury results from the corporation's injury, the resulting claim is derivative and the individual lacks standing to raise it in a direct action." *Id.*, ¶43.

¶68 Applying the law as we have summarized to this point, it is evident that Young lacks standing to bring a direct claim for any injury to Arrowhead Systems. There can be no dispute that the injury at issue was to the corporation when it failed to receive advice about a tax strategy that can be implemented only by international exporters. Young, as an individual, was not an international exporter. That is, the "right [that Young seeks] to be enforced," in the words of the case law, belongs to Arrowhead Systems, because the tax strategy would have been implemented by the exporting corporation, not by Young individually. Young has not grounded any claims on any contract to which he, and not the corporation, was a party, nor has he alleged that the accountants owed him a

28

pertinent duty independent of his status as a shareholder. *See Krier v. Vilione*, 2009 WI 45, ¶31 n.13, 317 Wis. 2d 288, 766 N.W.2d 517 (an individual shareholder claim might be based on the shareholder being party to a contract or on a duty owed to the shareholder individually, independent of his or her status as a shareholder). Thus, Young's alleged personal lost benefit, while easily predicted as flowing from the lost benefit to the corporation, would be derivative of the lost benefit to the corporation. Young confuses *predictability* of harm to him with *direct injury* to him, as described in the case law that we have summarized.

¶69 However, Young suggests that the shareholder-standing rule should not apply here because he is the sole shareholder of a Subchapter S corporation. We first address the sole shareholder aspect of the argument and then the Subchapter S aspect.

¶70 There are two problems with the sole shareholder aspect of Young's argument. First, the shareholder-standing rule, as described in case law, does not provide for an exception based solely on the fact that the number of shareholders of corporation is small, even down to one. The case that *Rose* cites for the shareholder-standing rule, *Marshfield*, relies for the rule on an older case, *Button*, which stated that simply because a single individual owns all shares of a corporation does not entitle the individual to disregard the fact that the corporation is a separate entity and to sue individually for damages to the individual's investment. *See Rose*, 56 Wis. 2d at 229 & n.7 (quoting *Marshfield*, 269 Wis. 519, relying on *Button*, 61 Wis. 20).

¶71 In *Button*, a replevin action, the plaintiff was the sole owner of all stock in a corporation. *Button*, 61 Wis. at 20-21. The circuit court directed the jury to find that the plaintiff had title to the property at issue in the replevin

because the corporation owned the property. *Id.* at 21. Our supreme court reversed on the ground that "the plaintiff, as the sole stockholder of the corporation, is not the legal owner of the property. He may have an equitable interest in it, but in this action he must show a legal title to the property in himself in order to recover, and he has shown that such title is in another person," namely, in the corporation. *Id.* at 24-25.

¶72 We cannot ignore the fact that the court in *Marshfield* relied on *Button* in articulating the shareholder-standing rule and that *Rose* relied on *Marshfield*. This signals firm adherence by our supreme court to the shareholder-standing rule even when the corporation has but one shareholder.

¶73 The second reason we reject Young's sole-shareholder argument is that we consider persuasive the reasoning by a federal court of appeals that the shareholder-standing rule applies even when the corporation has only few or one shareholder. *See Kush v. American States Ins. Co.*, 853 F.2d 1380, 1383 (7th Cir. 1988).[18] While denial of standing to a sole shareholder to sue for harms to the corporation may seem "harsh, or, at least, counter-intuitive," it is justified because the sole shareholder has elected to use the corporate form. *Id.* at 1384. "That form [provides] several advantages over operations as an unincorporated sole proprietorship, not the least of which [is] limitation of liability. In return, [the shareholder gives] up several prerogatives, including that of direct legal action to redress an injury to him [or her] as primary stockholder in the business." *Id.*; *see also Krier*, 317 Wis. 2d 288, ¶25 ("'where an individual creates a corporation as a

---

[18] *Kush*, relies on Illinois law related to standing, but the Illinois law cited by the federal court appears to closely track the Wisconsin law that we have summarized in the text. *Kush v. American States Ins. Co.*, 853 F.2d 1380, 1383 (7th Cir. 1988).

means of carrying out his [or her] business purposes he [or she] may not ignore the existence of the corporation in order to avoid its disadvantages'") (quoting *Terry v. Yancey*, 344 F.2d 789, 790 (4th Cir. 1965)).

¶74    We now turn to the Subchapter S corporation aspect of Young's argument. To repeat, there is no dispute that the income and losses of Arrowhead Systems flowed through to Young individually, and accordingly he was obligated to pay any corporate tax liability out of corporate income distributed to him for that purpose. Young asserts that, as a pass-through corporation, Arrowhead Systems paid "no income tax" and as a result Young himself "uniquely suffered" from the accountants' omission. We are not persuaded, however, that there is a basis in Wisconsin law to depart from the shareholder-standing rule for that reason, and the weight of persuasive authority appears to be against it.

¶75    Arrowhead Systems was a corporation, not a limited liability company.[19] Rights that accrued to Arrowhead Systems belong to the corporation, not to Young. *See Krier*, 317 Wis. 2d 288, ¶¶31-34 (shareholder of Subchapter S

---

[19] Our supreme court has explained that a limited liability company is "'an unincorporated association of investors, members in LLC parlance, whose personal liability for obligations of the venture is limited to the amount the member has invested,'" and therefore claims involving LLC's fall outside the shareholder-standing rule. *See Marx v. Morris*, 2019 WI 34, ¶22, 386 Wis. 2d 122, 925 N.W.2d 112 (quoted source omitted). For the first time in his reply brief, Young effectively asks this court to extend some reasoning in *Marx* from the LLC context to the Subchapter S corporation context. There is reasoning in *Marx* that could point in this direction. *See id.*, ¶¶38, 44 n.24. But there are two problems with this argument. First, Young did not make a *Marx*-based argument until the reply brief, depriving the accountants of an opportunity to respond to this particular argument. Second, the court in *Marx* did not indicate that the shareholder-standing rule should not apply to shareholders in Subchapter S corporations. *See id.* Given the tardy argument by Young, the limited discussion on this specific topic in *Marx*, and the other case law that we reference, we decline to consider taking what would be a new direction in Wisconsin law.

corporation could sue accountants only in a derivative capacity; "[i]n short, the assets of a corporation belong to that corporation").

¶76 We consider persuasive federal court of appeals decisions applying the shareholder-standing rule in related contexts. *See AFY v. Badami*, 734 F.3d 810, 820 (8th Cir. 2013); *Smith Setzer & Sons, Inc. v. South Carolina Procurement Rev. Panel*, 20 F.3d 1311, 1318 (4th Cir. 1994). *AFY* involved the sole shareholders of a Subchapter S corporation seeking to appeal a bankruptcy court decision based on their interests as shareholders. *AFY*, 734 F.3d at 820. "'While an S corporation is treated differently for taxation purposes, it remains a corporation in all other ways, and it and its shareholders are separate entities'" who generally do not have standing to sue on the corporation's behalf." *Id.* (quoting *Smith Setzer*, 20 F.3d at 1318). The court in *AFY* continued, "Any impact on the [plaintiffs'] personal tax liability is an indirect, rather than a direct, consequence." *Id.*

¶77 The individual plaintiff in *Smith Setzer* was the shareholder of an S corporation and sought to bring a constitutional challenge to a contractor preference provision. *See Smith Setzer*, 20 F.3d at 1316-17. The shareholder claimed an economic injury based on the corporation's loss of revenue, namely, the economic injury being loss of income to himself. *See id.* The court held that any injuries to the individual plaintiff were derived through the corporation, and it was "of no matter" that the corporation was an S corporation. *See id.* at 1318. As the court explained, "While an S corporation is treated differently for taxation purposes, it remains a corporation in all other ways, and it and its shareholders are separate entities. This being the case, [the shareholder] lacks standing to assert this claim." *Id.*

¶78 As one federal district court has noted in this context, one practical problem with a proposed exception for the "pass through" corporation is that allowing the sole shareholder of an S corporation to recover as a shareholder "would permit both the corporation and its shareholder to recover for the same loss, requiring complex allocation of damages." *See Economic Enter., Inc. v. T.D. Bank N.A.*, No. 3:10-cv-157 (VLB), 2011 WL 446891, at *4–5 (D. Conn. Feb. 3, 2011).[20] Here, without clear rebuttal from Young, the accountants effectively made this argument to the circuit court. The accountants contended that, under Young's approach, it would not be possible for the circuit court to construct a set of jury instructions that would accurately and fairly "divvy up the dollars they are awarding" between the corporation and Young.

¶79 Young points to evidence supporting the inference that he "was himself a client" of the accountants, in addition to Arrowhead Systems being a client. But a separate relationship between Young and the accountants is not the basis of the claims here. The entire thrust of the complaint is that the accountants failed to provide adequate tax services to exporter Arrowhead Systems regarding a tax strategy relating to its international exports, not that these tax services were not provided to Young as an individual client.[21] It is alleged that Bovee prepared Young's personal returns, but that does not change the analysis. Young's claims

---

[20] The standing analysis in *Economic Enterprises* is based on the substantive law of Connecticut, but the rationale of the opinion appears consistent with Wisconsin law cited above. *Economic Enter., Inc. v. T.D. Bank N.A.*, No. 3:10-cv-157 (VLB), 2011 WL 446891, at *4–5 (D. Conn. Feb. 3, 2011).

[21] The accountants distinguish a California federal district court opinion on which Young relies on the ground that it involved a claim that an accounting firm provided negligent tax advice concerning *personal* tax returns, and not concerning a tax strategy for *a corporation*. *See Miller v. Taryle*, No. CV 13-02390 GAF (JCx), 2013 WL 12205851 (C.D. Cal., Sept. 10, 2013). Young has no reply on this point, conceding it. *See United Coop.*, 304 Wis. 2d 750, ¶39.

allege exclusive injury to the corporation, with Young individually allegedly suffering predictable but derivative injury.

¶80    Young cites two cases in which a proper direct action by a shareholder has been found, but in each of those cases the basis to allow a direct action was an allegation that minority shareholders' rights were affected in a manner distinct from the effect on other shareholders, and therefore the injury to the plaintiff minority shareholder was an injury primarily to the minority shareholders as individuals.  *See Notz v. Everett Smith Grp., Ltd.*, 2009 WI 30, ¶20, 316 Wis. 2d 640, 764 N.W.2d 904; *Jorgensen v. Water Works, Inc.*, 2001 WI App 135, 246 Wis. 2d 614, 630 N.W.2d 230.  These were both shareholder oppression cases.  *See Notz*, 316 Wis. 2d 640, ¶¶4, 26-28; *Jorgensen*, 246 Wis. 2d 614, ¶¶16-18.  That is, they were based on the proposition that individual minority shareholders must be allowed to challenge unfair treatment by directors who control a corporation.  Young fails to develop an argument from these cases involving alleged shareholder oppression that could apply to the starkly different facts here.  Young cannot argue that he was subject to oppression by himself.

## CONCLUSION

¶81    For all these reasons, we affirm summary judgment in favor of the accountants on all claims.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.